**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 16a0162n.06

Case No. 14-3653

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Mar 22, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| IN RE: ANHEUSER-BUSCH BEER LABELING MARKETING AND SALES PRACTICES LITIGATION. | ) ) ) ) ) ) ) ) ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |

BEFORE: KEITH, MERRITT, and BOGGS, Circuit Judges.

BOGGS, Circuit Judge. Various consumers in seven states brought class-action lawsuits with state and federal claims against Anheuser-Busch Companies, LLC ("Anheuser-Busch"), alleging that Anheuser-Busch intentionally overstates the alcohol content of many of its malt beverages on those beverages' labels. After the Judicial Panel on Multidistrict Litigation consolidated the actions into one multidistrict litigation in the Northern District of Ohio, the plaintiffs filed an amended complaint, which sought to certify an additional class of plaintiffs from forty-eight states.

Anheuser-Busch moved to dismiss on the ground that any alleged misstatement of alcohol content, even if intentional, fell within a tolerance of 0.3 percent created by a federal beverage-labeling regulation that has been incorporated into the relevant states' law. The district

court agreed. After observing that the plaintiffs had conceded that all of their claims would fail if Anheuser-Busch's alleged misstatements did not run afoul of federal regulations, the court dismissed the plaintiffs' complaint. For the reasons given below, we affirm the judgment of the district court.

I

Anheuser-Busch brews various malt beverages, among them Budweiser, Bud Ice, Bud Light Platinum, Michelob, Michelob Ultra, Hurricane High Gravity Lager, King Cobra, Busch Ice, Natural Ice, Black Crown, and Bud Light Lime. The plaintiffs—individuals who either consume or consumed one or more of these malt beverages—claim that Anheuser-Busch employs sophisticated process-control technology that enables it to precisely measure and control the alcohol content of its malt beverages. According to the plaintiffs, Anheuser-Busch does not use this technology to produce beverages that reflect the alcohol-by-volume content listed on its products' labels. On the contrary, the complaint alleges that Anheuser-Busch "uses its precise knowledge of the alcohol content of its products to deceive consumers."

The plaintiffs explain that Anheuser-Busch adds extra water to its products to dilute the alcohol content to levels below those represented on product labels. As a result, say the plaintiffs, Anheuser-Busch is able to save money on production costs and gain a competitive advantage over other brewers, while intentionally misrepresenting the quality of its products to consumers. The plaintiffs claim that they purchased malt beverages in reliance on the misrepresentations on Anheuser-Busch's product labels, would not have made those purchases if they had known that the alcohol content was in fact lower than the amount stated on the labels, and ultimately received beer with less value than the beer that Anheuser-Busch promised on its labels.

The plaintiffs sought redress for the harm they allegedly suffered by bringing actions in federal district court in the Northern District of California, the District of Colorado, the Middle District of Florida, the District of New Jersey, the Northern District of Ohio, the Eastern District of Pennsylvania, and the Northern District of Texas. The Judicial Panel on Multidistrict Litigation consolidated the cases into one litigation, which it assigned to the Northern District of Ohio. The plaintiffs then filed an amended complaint, seeking certification of classes of plaintiffs residing in each of the seven states. Each class of plaintiffs sought relief under state consumer-protection and—with the exception of the Florida plaintiffs—warranty law, as well as Section 109(d) of the federal Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301–2312, which creates a federal cause of action for the violation of a warranty implied by state law, *see id.* §§ 2301(7), 2310(d)(1)(B). The plaintiffs also proposed a new nationwide class comprising residents of all forty-eight contiguous states, which alleged violations of the law of Missouri, where Anheuser-Busch maintains its principal place of business.

Anheuser-Busch moved to dismiss on the ground that the plaintiffs failed to state a claim upon which the district court could grant relief. Anheuser-Busch argued that because the plaintiffs never alleged that it had overreported the alcohol content in its malt beverages by more than 0.3 percent, Anheuser-Busch fully complied with state and federal regulations governing alcoholic beverages, thereby precluding liability under state consumer-protection law. In particular, Anheuser-Busch pointed out that a federal regulation codified at 27 C.F.R. § 7.71 explicitly allows the alcohol content of the malt beverages in question to diverge by up to 0.3 percent from the alcohol content stated on the beverages' labels. *See* 27 C.F.R. § 7.71(c)(1). And although states may impose their own labeling regulations with no tolerance or a tolerance more forgiving than that set forth in § 7.71, *see id.* § 7.71(a), each of the eight states whose law

3

is in question has adopted that federal tolerance of 0.3 percent into state law. Drawing on the principle of statutory construction "that the specific governs the general," *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992), Anheuser-Busch argued that because the plaintiffs' "general" consumer-protection and warranty claims conflicted with the "specific" state and federal beverage-labeling regulations that allow for a variance of up to 0.3 percent, its compliance with the latter regulations precluded the former claims. Anheuser-Busch also pointed out that many of the states have statutory or common-law safe-harbor rules, which exempt from consumer-protection law any conduct permitted under state or federal law. And because Section 109(d) of the MMWA simply provides a federal claim based on a breach of a state-law warranty, *see* 15 U.S.C. §§ 2301(7), 2310(d)(1)(B), Anheuser-Busch argued that the plaintiffs' federal warranty claims should fail, as well.

After reviewing two additional written submissions from each party and hearing oral argument, the district court granted Anheuser-Busch's motion to dismiss. The court first observed that "Defendant has asserted, and Plaintiffs have not contested, that if the Court finds that Anheuser-Busch's alleged over-reporting of alcohol content is permitted under 27 C.F.R. § 7.71(c), this action must be dismissed." The court explained that "Plaintiffs have not disputed this premise in any of their briefing, and Plaintiffs' counsel explicitly conceded this point at oral argument." The court then turned to § 7.71 and examined the plaintiffs' contention that the plain language of the regulation prohibits Anheuser-Busch from intentionally targeting the lower end of the statutory tolerance. Finding no indication of an exception for intentional variations in the text or structure of the regulation, the court rejected the plaintiffs' "intent-based" reading of the regulation and concluded that the "protection afforded by § 7.71(c)(1) is provided without regard to the cause of any deviation or variation, and without regard to the intention behind any

4

misstatement of alcohol content within the defined tolerance range." Having heard no argument from the plaintiffs that their state-law claims and corresponding MMWA claims should not fall along with their interpretation of § 7.71, the court granted Anheuser-Busch's motion to dismiss.

The plaintiffs appealed and now argue that the district court erred when it failed to adopt an intent-based reading of § 7.71. In the alternative, they argue that because Anheuser-Busch's compliance with the state and federal regulations does not entitle it to immunity from state consumer-protection or warranty law, the district court should have considered those claims irrespective of whether or not § 7.71 permits Anheuser-Busch's conduct. As for the district court's observation that the plaintiffs never raised such an argument, the plaintiffs disagree and point to various pages in their briefing to the district court where they purportedly did so. The plaintiffs also contend that any failure to properly raise the argument before the district court should not prevent this court from considering that argument on appeal, since the Supreme Court's intervening decision in *POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228 (2014), which in the plaintiffs' view requires this court to reverse the judgment of the district court, was not available to the parties in the district court.

II

We review de novo a district court's decision granting a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007). While we must "accept as true" all of the factual allegations made in a complaint, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), we are not bound by any legal conclusion "couched as a factual allegation," *ibid.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

5

With this standard of review in mind, we proceed by considering the plaintiffs' intent-based reading of § 7.71 before turning to their argument that their claims survive the district court's interpretation of that regulation.

III

In the wake of the ratification of the Twenty-First Amendment, Congress enacted the Federal Alcohol Administration Act ("FAAA" or the "Act"), Pub. L. No. 74-409, 49 Stat. 977 (1935) (codified as amended at 27 U.S.C. §§ 201–219a), which, among other things, authorized the Federal Alcohol Administration ("FAA") to eliminate "unfair competition" in the production and sale of alcoholic beverages. *Id.* § 5, 49 Stat. at 981 (codified at 27 U.S.C. § 205). As amended, the Act empowers the Secretary of the Treasury—who acquired the FAA's authority in 1939, *see* Reorganization Plan No. III, § 2, 54 Stat. 1231, 1232 (1939)—to adopt regulations governing the labeling of alcoholic beverages that will "provide the consumer with adequate information as to the identity and quality of the product[s] [and] the alcoholic content thereof[.]" 27 U.S.C. § 205(e), *invalidated in part by Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995). The Act also empowers the Secretary to write regulations that "will prohibit deception of the consumer with respect to [alcoholic beverages]" and "will prohibit statements on the label that are . . . fals[e] [or] misleading[.]" *Ibid.* The Secretary exercised his authority through the Bureau of Alcohol, Tobacco and Firearms ("ATF") between 1972 and 2003, at which time the Secretary transferred the ATF's FAAA responsibilities to the Alcohol and Tobacco Tax and Trade Bureau ("TTB"). *See* Revised Treasury Department Order 120-01, 68 Fed. Reg. 3583, 3583 (2003); Treasury Department Order 221, 37 Fed. Reg. 11,696, 11,696 (1972).

In 1936, the FAA adopted a general provision, now found at 27 C.F.R. § 7.29(a)(1), that forbids any statement on a malt-beverage label that is "false or untrue in any particular, or that,

irrespective of falsity, directly, or by ambiguity, omission, or inference, . . . tends to create a misleading impression." Labeling & Advertising of Malt Beverages, 1 Fed. Reg. 2013, 2015 (1936); 27 C.F.R. § 7.29(a)(1). The FAA's 1936 regulations also prohibited statements of alcohol content on malt-beverage labels except where required by state law. 1 Fed. Reg. at 2015. After a federal court enjoined that latter prohibition in 1992, the ATF enacted 27 C.F.R. § 7.71, which continues to govern how alcohol content must appear on malt-beverage labels today. Alcoholic Content Labeling for Malt Beverages, 58 Fed. Reg. 21,228, 21,228 (1993). Paragraph (b)(2) of § 7.71 states that for any labels on "malt beverages containing 0.5 percent or more alcohol by volume, statements of alcoholic content shall be expressed to the nearest one-tenth of a percent, subject to the tolerance permitted by paragraph (c)(1) . . . of this section." 27 C.F.R. § 7.71(b)(2). Paragraph (c)(1), in turn, states that "[f]or malt beverages containing 0.5 percent or more alcohol by volume, a tolerance of 0.3 percent will be permitted, either above or below the stated percentage of alcohol." *Id.* § 7.71(c)(1).

Consistent with the states' "broad authority" to regulate the sale of alcoholic beverages within their borders, *Sam & Ali, Inc. v. Ohio Dep't of Liquor Control*, 158 F.3d 397, 402 (6th Cir. 1998) (Krupansky, J., concurring in the judgment), many states have enacted their own legislation and regulations governing the manufacture and sale of alcoholic beverages. Each of the eight states whose law is at issue in this case—California, Colorado, Florida, Missouri, New Jersey, Ohio, Pennsylvania, and Texas—has such statutory and regulatory law in place. Although § 7.71 does not apply where states have chosen to impose their own requirements for statements of alcohol content, *see* 27 C.F.R. § 7.71(a), both parties agree that the eight states have all incorporated § 7.71 into state law, either explicitly in their own statutes and regulations or implicitly, by forbidding the sale of malt beverages without TTB-approved labels. *See*

7

Appellant Br. 13; Appellee Br. 5; *see also* Cal. Bus. & Prof. Code § 25200, *amended by* Act of Oct. 1, 2015, ch. 420, § 2, 2015 Cal. Legis. Serv.; Fla. Stat. § 563.045; Colo. Code Regs. § 203-2:47-904(F)–(G); Fla. Admin. Code Ann. r. 61A-4.005; Mo. Code Regs. Ann. tit. 11 § 70-2.060(1); N.J. Admin. Code § 13:2-27.1(a)(4); Ohio Admin. Code 4301:1-1-43(D)(3); 40 Pa. Code § 9.108(b)(1); 16 Tex. Admin. Code § 45.79; Pa. Liquor Control Bd., Advisory Op. 14-404 (2014); Fla. Dep't of Bus. & Prof'l Regulation, Form DBPR-ABT 1: Brand/Label Registration, at 4 (2010); Ohio Dep't of Commerce, Form DLC 1511: Product/Label Registration, at 2 (2015).

Because each state has in some way incorporated § 7.71 into its own alcohol-labeling regime, Anheuser-Busch moved to dismiss and argued to the district court that the tolerance created by § 7.71(c)(1) protects the manufacturer from state-law liability for any deviations in alcohol content within that tolerance, intentional or not. The plaintiffs, on the other hand, argued for an intent-based reading of § 7.71 that would not protect producers who intentionally sell malt beverages with less alcohol than is stated on the beverage label. The district court agreed with Anheuser-Busch. The court emphasized that "courts must, in the first instance, focus on the plain wording of the provision at issue." Because nothing in the text of § 7.71 distinguishes intentional from unintentional deviations in alcohol content on beverage labels, the court held that the language of § 7.71(c)(1) creates a safe harbor for any brewer who does not exceed the tolerance, irrespective of whether the deviation from the label was intentional.

On appeal, the plaintiffs raise two arguments in support of their assertion that "the most reasonable construction of Section 7.71 is that the tolerance language allows an unintentional variance of no more than .3% from the claimed level while intentional dishonesty about the alcohol level remains prohibited." Appellant Br. 35. First, they argue that the word "tolerance" is a "technical or specialized word" that permits only unintentional variations. *Id.* at 38. Second,

8

the plaintiffs argue that the district court's interpretation of § 7.71 is inconsistent with the context and purpose of the regulatory framework created by the FAA, ATF, and TTB and of that framework's adoption into state law. After examining the plain text of § 7.71, we contend with each argument in turn.

A

We begin our analysis with the text of 27 C.F.R. § 7.71. *See Milner v. Dep't of Navy*, 131 S. Ct. 1259, 1264 (2011). As we have mentioned, so long as state law does not impose its own requirements, when a manufacturer places the alcohol content of a malt beverage on that beverage's label, § 7.71 sets forth the exact requirements for how that alcohol content must appear. 27 C.F.R. § 7.71(a). Paragraph (b)(2) of § 7.71 provides that "[f]or malt beverages containing 0.5 percent or more alcohol by volume, statements of alcoholic content shall be expressed to the nearest one-tenth of a percent, subject to the tolerance permitted by paragraph (c)(1)." *Id.* § 7.71(b)(2). Paragraph (c)(1) sets forth that tolerance in greater detail:

> For malt beverages containing 0.5 percent or more alcohol by volume, a tolerance of 0.3 percent will be permitted, either above or below the stated percentage of alcohol. Any malt beverage which is labeled as containing 0.5 percent or more alcohol by volume may not contain less than 0.5 percent alcohol by volume, regardless of any tolerance.

*Id.* § 7.71(c)(1).

Nothing in the language of § 7.71(c)(1) distinguishes intentional from unintentional variances within the applicable tolerance of 0.3 percent. The key word in § 7.71(c)(1)—"tolerance"—strongly suggests that the ATF intended no such distinction. The regulations do not define the word "tolerance," and "[i]n the absence of such a definition, [courts] construe a statutory term in accordance with its ordinary or natural meaning." *FDIC v. Meyer*, 510 U.S. 471, 476 (1994). The relevant ordinary meaning of the word "tolerance" says nothing about the

9

intentionality of a deviation. *See, e.g.*, American Heritage Dictionary 1817 (4th ed. 2006) (defining "tolerance" as "[l]eeway for variation from a standard"); Webster's Third New International Dictionary 2405 (1981) (defining "tolerance" as "the allowable deviation from a standard"). Moreover, the phrase "a tolerance of 0.3 percent *will be permitted*" employs mandatory language analogous to "shall," which we must ordinarily regard as inconsistent with judicially created exceptions. *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) (explaining that "mandatory" language, such as "'shall,' . . . normally creates an obligation impervious to judicial discretion"); *Hewitt v. Helms*, 459 U.S. 460, 471 (1983) (referring to "shall," "will," and "must" as "language of an unmistakably mandatory character"), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995).

Nor does the language in any other part of § 7.71 suggest that the ATF intended the tolerance in § 7.71(c)(1) to apply only when producers do not intentionally target its lower end. On the contrary, the ATF's inclusion of additional strict limitations on deviations in other parts of the same regulation suggests that the ATF knew how to eliminate or restrict tolerances when it saw fit to do so. For example, the latter part of Paragraph (c)(1) establishes a rule whereby any malt beverage labeled as containing 0.5 percent or more alcohol by volume "may not contain less than 0.5 percent alcohol by volume, regardless of any tolerance." 27 C.F.R. § 7.71(c)(1). And Paragraph (c)(2) provides that any malt beverage labeled as "low alcohol" or "reduced alcohol" must not have an alcohol content that equals or exceeds 2.5 percent alcohol by volume without regard to any tolerance permitted by Paragraph (c)(1). *Id.* § 7.71(c)(2). These provisions render the absence of any language limiting the tolerance in Paragraph (c)(1) all the more striking.

In short, nothing in the text of § 7.71 implies any distinction based on the motive of the manufacturer.

B

The plaintiffs counter that the word "tolerance" does not bear its ordinary meaning in the context of the § 7.71. They argue that in light of the "high-tech manufacturing setting" in which "the alcohol content of beer is controlled using sophisticated equipment and statistical process control methods," the word "tolerance" is a term of art with a specialized meaning. Appellant Br. 38. According to the plaintiffs, that specialized meaning does take the intent of a producer into account and allows for a "deviation from a standard" only when that deviation is unintentional.

Finding no evidence for this specialized meaning in the text of the FAAA or TTB regulations, the plaintiffs point to a guidebook on measuring devices entitled "Handbook 44," which is published by the National Institute of Standards and Technology ("NIST"), an organization within the Department of Commerce that Congress has authorized to develop "methods for testing materials, mechanisms, structures, equipment, and systems, including those used by the Federal Government." 15 U.S.C. § 272(b)(8); *see also* Nat'l Inst. of Standards & Tech., Handbook 44, at 1 (2014) ("Handbook 44"). In a section entitled "Tolerances for Commercial Equipment," Handbook 44 provides:

> Tolerances are primarily accuracy criteria for use by the regulatory official. However, when equipment is being adjusted for accuracy, either initially or following repair or official rejection, the objective should be to adjust as closely as practicable to zero error. *Equipment owners should not take advantage of tolerances by deliberately adjusting their equipment to have a value, or to give performance, at or close to the tolerance limit.* Nor should the repair or service personnel bring equipment merely within tolerance range when it is possible to adjust closer to zero error.

Handbook 44 at A-4 (emphasis added).

As further evidence for their specialized reading of the word "tolerance," the plaintiffs point to two cases applying California law, which incorporates Handbook 44. *See* Cal. Bus.

11

& Prof. Code § 12107. Even though a California statute considers odometers to be "[c]orrect" if their readings stay within the bounds of a four-percent tolerance created by the NIST, *see id.* § 12500(c), the two courts relied on Handbook 44's exhortation that "[e]quipment owners should not take advantage of tolerances" to hold that automobile manufacturers could not claim that their odometers were "correct" as a matter of law if they had intentionally miscalibrated the odometers, even if the extent of any miscalibration was within the tolerance specified in the statute. *See In re Nissan N. Am., Inc. Odometer Litig.*, 664 F. Supp. 2d 873, 888 (M.D. Tenn. 2009); *Lopez v. Nissan N. Am., Inc.*, 135 Cal. Rptr. 3d 116, 123 (Cal. Ct. App. 2011).

None of this explains why Handbook 44 or the two cases applying its standards to California law is relevant to the question of what the ATF intended when it used the word "tolerance" in § 7.71. The district court found Handbook 44 inapplicable—and the plaintiffs' invocation of California law irrelevant—on the ground that the NIST does not regulate "alcoholic beverages, or the[ir] labeling." We agree. The NIST standards govern "weights and measures and weighing and measuring devices," not products or their labels as does § 7.71. Handbook 44 at 1; *see also* 15 U.S.C. § 272(b)(6) (authorizing the NIST to "assist industry in the development of measurements, measurement methods, and basic measurement technology"). And nothing in Title 27 of the Code of Federal Regulations references Handbook 44, nor is there any other evidence that the ATF considered NIST standards when drafting § 7.71.

The plaintiffs urge that Handbook 44 is relevant to this case because each of the eight states has incorporated NIST standards into state law. On their view, the states' adoption of Handbook 44 "provides critical insight into the States' view of the intentional abuse of 'tolerances,' and shows that the States did not intend to exempt such conduct from scrutiny." Appellant Br. 23. But the plaintiffs do not point to any evidence that the legislatures or

12

administrative agencies of any of the eight states intended the NIST standards to apply outside of the context for which they were expressly adopted. Indeed, the plaintiffs themselves implied quite the opposite when they informed the district court that "four of the states at issue in this case (California, Missouri, New Jersey, and Texas) have explicitly adopted the *same* labeling requirements for claims of alcohol content as has the TTB." (emphasis added).

Both odometer litigations involved the application of NIST standards to an NIST tolerance established specifically for odometers and explicitly adopted into California law governing weights and measures. *See* Cal. Bus. & Prof. Code § 12107. In this case, by contrast, the applicable tolerance derives from an entirely separate regulation enacted by a distinct regulatory body, the ATF. In this context, the states' decision to embrace the NIST's general guidelines, which include an admonition that equipment owners "*should* not" take advantage of tolerance levels for measuring devices, Handbook 44 at A-4 (emphasis added), is less relevant than their adoption of § 7.71's specific alcohol-labeling regulation, under which "a tolerance of 0.3 percent *will be* permitted," 27 C.F.R. § 7.71(c)(1) (emphasis added). Just as "[e]vils in the same field" may "requir[e] different remedies," *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489 (1955), states may and do choose to confront the same evil in different fields with different remedies, *see, e.g.*, *Wilder v. Aetna Life & Cas. Ins. Co.*, 433 A.2d 309, 310 (Vt. 1981). Such is the case here.

The plaintiffs' reliance on the NIST Handbook reveals an additional flaw in their assertion that the word "tolerance" necessarily applies to unintentional variances only. If this is what "tolerance" means, the NIST would not have had any reason to separately counsel equipment owners not to "take advantage of tolerances by deliberat[e]" conduct. Handbook 44 at A-4. That same quandary also exists in the regulatory scheme that the TTB administers, since

other provisions explicitly create intent-based exceptions to applicable tolerances. 27 C.F.R. § 27.42a, for example, provides that:

> Still wines may contain not more than 0.392 gram of carbon dioxide per 100 milliliters of wine; except that a tolerance to this maximum limitation, not to exceed 0.009 gram of carbon dioxide per 100 milliliters of wine, will be allowed where the [excess] amount of carbon dioxide . . . was due to mechanical variations which could not be completely controlled under good commercial practices. *Such tolerance will not be allowed where it is found that the limitation . . . is continuously or intentionally exceeded.*

*Ibid.* (emphasis added). Likewise, 27 C.F.R. § 25.142 denies manufacturers the benefit of a tolerance that concerns the volume of beer in bottles "when filling is not conducted in compliance with good commercial practice." *Id.* § 25.142(d). And under 27 C.F.R. § 4.37, a tolerance for discrepancies regarding the volume of wine in a bottle "shall be allowed" for those discrepancies that occur "due exclusively to errors in measuring which occur in filling conducted in compliance with good commercial practice," *id.* § 4.37(d)(1), or "due exclusively to differences in the capacity of containers, resulting solely from *unavoidable* difficulties in manufacturing such containers so as to be of uniform capacity," *id.* § 4.37(d)(2) (emphasis added).

That the ATF believed it necessary to explicitly include intent-based exceptions when using the term "tolerance" in certain provisions supports the conclusion that the ATF did not understand that term to apply only to unintentional variances. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' . . . We refrain from concluding here that the differing language in the two subsections has the same meaning in each." (first alteration in original) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722

(5th Cir. 1972) (per curiam))). In response, the plaintiffs argue that "the fact that the TTB described intent more explicitly in other regulations has no bearing on the appropriate construction of Section 7.71." Appellant Br. 43. But as the plaintiffs themselves repeatedly suggest in support of their own arguments, courts must read regulations as a whole. *See Dada v. Mukasey*, 554 U.S. 1, 16 (2008) ("In reading a statute we must not 'look merely to a particular clause,' but consider 'in connection with it the whole statute.'" (quoting *Kokoszka v. Belford*, 417 U.S. 642, 650 (1974))).

The plaintiffs draw on the TTB's and ATF's own publications to make one last argument in favor of giving the word "tolerance" a "technical gloss" that allows only unintentional variances. Appellant Br. 38. They point out that the ATF designed the tolerance in § 7.71(c)(1) to allow for "normal variations in the production of beer, ale, and so forth brought about by differences in raw materials and brewing practices." *Id.* at 42 (quoting 58 Fed. Reg. at 21,229). And in ATF Ruling 80-3, the ATF wrote that the intent of tolerances related to caloric, carbohydrate, protein, and fat labeling on malt beverages "is to provide for normal production and analytical variables while continuing to ensure that the labeling is not misleading to the consumer." ATF Ruling 80-3, 1980-2 A.T.F. Q. Bull. 13. The plaintiffs also argue that TTB Ruling 2013-2, a ruling that allows manufacturers to include alcohol content as part of a voluntary "serving facts" statement on the back of malt-beverage containers, supports their argument because the ruling incorporates "explicit language regarding intent." Appellant Br. 45. On their view, because "it is inconceivable that the TTB intended to prohibit misleading statements of alcohol content based on 'tolerances' on one part of a product label but allow the same misstatements elsewhere on the label," this court must give § 7.71(c)(1) an intent-based

reading "so as to avoid an unjust or an absurd conclusion." *Ibid.* (quoting *In re Chapman*, 166 U.S. 661, 667 (1897)).

The difficulty with the plaintiffs' argument is that even if the tolerance created by § 7.71(c)(1) was designed to allow for "normal variations in the production" of malt beverages, nothing in that statement of policy evinces an intent to disallow intentional variations. As we have explained, the ATF's inclusion of an intent-based exception to other tolerances in related regulations strongly supports the opposite conclusion. Nor does TTB Ruling 2013-2 help the plaintiffs. Ruling 2013-2, which regulates how alcohol content must appear in voluntary "serving facts" labels that list caloric and fat content and other information on the back of wine, distilled-spirit, and malt-beverage containers, explicitly allows malt-beverage manufacturers the same tolerance that is set forth in § 7.71(c).

Given the structural difficulties that accompany the plaintiffs' reading of the word "tolerance," as well as the lack of any evidence that the ATF or state legislatures or regulators meant anything other than "the allowable deviation from a standard" when they used the word "tolerance," we conclude that the word bears its ordinary meaning.

C

Having failed to show that the word "tolerance" is a term of art, the plaintiffs argue that "any decision about the meaning of Section 7.71 should [be] made in light of the purposes of the enabling statute [that] the Section was enacted to implement." *Id.* at 36. According to the plaintiffs, Congress designed the FAAA to "prevent consumer deception." *Id.* at 37. To that end, Congress prohibited misleading labels on alcoholic beverages and authorized the Secretary of the Treasury to explicate and enforce the prohibition. *See* 27 U.S.C. § 205(e). The importance of that policy goal, the plaintiffs claim, is evidenced in the FAA's adoption of a

"broad prohibition [against] any statement on an alcoholic beverage label which is 'false or untrue in any particular.'" Appellant Br. 37 (quoting 27 C.F.R. § 7.29(a)(1)). The plaintiffs suggest that an interpretation of § 7.71(c) that ignores the intent behind a deviation from the alcohol-by-volume content listed on a malt-beverage label would subvert this core purpose of the FAAA and § 7.29(a)(1) and should therefore be avoided.

The plaintiffs are correct that "a court should not interpret each word in a statute with blinders on, refusing to look at the word's function within the broader statutory context." *Id.* at 36 (quoting *Abramski v. United States*, 134 S. Ct. 2259, 2267 n.6 (2014)). Context may be relevant even when interpreting unambiguous language, since context is often the reason that the language is unambiguous in the first place. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000). But it is equally true that where, as here, the text of a regulation is clear, courts may not rely on broad conceptions of statutory or regulatory purpose to overcome otherwise clear language, because "no law pursues its purpose at all costs, and . . . textual limitations upon a law's scope are no less a part of its 'purpose' than its substantive authorizations." *Rapanos v. United States*, 547 U.S. 715, 752 (2006) (plurality opinion).

Moreover, interpreting § 7.71(c) according to its plain meaning would not, as the plaintiffs contend, conflict with the purpose of the regulatory scheme as a whole. We can easily reconcile § 7.29(a)'s general prohibition against false or misleading statements with § 7.71(c)(1)'s later-enacted, specific allowance of a tolerance of 0.3 percent by concluding that the ATF determined that such small variances are not misleading to consumers (and therefore not deceptive). The ATF clearly paid close attention to consumer expectations when devising tolerances. For example, the ATF eliminated any tolerance for understatements of alcohol content on beverages labeled as "low alcohol" on the ground that "it would be misleading to

consumers to purchase product containing more than the labeled content of alcohol when the low alcohol content may be a primary reason for the selection of a particular malt beverage." 58 Fed. Reg. at 21,230. In this context, we assume that the ATF concluded that the relatively minor variation specified in Paragraph (c)(1) would not meaningfully interfere with consumer expectations.

What is more, 27 C.F.R. § 7.29(a)'s prohibition against "[a]ny statement . . . that, irrespective of falsity . . . tends to create a misleading impression," 27 C.F.R. § 7.29(a)(1), does not obviously favor an intent-based reading of § 7.71(c) since the plaintiffs fail to explain why the producer's intent would have anything to do with whether a label that does not reflect the correct alcohol content in a malt beverage "tends to create a misleading impression" to consumers. In other words, a customer who is "misled" by a beverage label that overstates the alcohol-by-volume content of the beverage would be misled irrespective of the producer's intent.

D

In this case, the plain language of § 7.71 suggests that the relevant tolerance applies irrespective of the producer's intent. Nothing in the structure or content of the FAAA or other TTB regulations requires otherwise. *Cf. Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 552–53 (1987) ("When statutory language is plain, and nothing in the Act's structure or relationship to other statutes calls into question this plain meaning, that is ordinarily 'the end of the matter.'" (quoting *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984))). This reading of the regulation best fulfills the court's duty to reasonably construe provisions of a regulation harmoniously, *see FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959), as well as to construe specific provisions as exceptions to seemingly contradictory general provisions, *see RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065,

2071 (2012); *Morales*, 504 U.S. at 384. In light of the foregoing, we conclude that § 7.71 does not distinguish between intentional and unintentional deviations from the alcohol content listed on a malt-beverage label. Because the plaintiffs do not allege that Anheuser-Busch exceeded the tolerance created by § 7.71(c)(1), we agree with the district court that the record shows no violation of the relevant TTB regulations.

## IV

Having concluded that the district court properly held that Anheuser-Busch did not violate § 7.71, we must ask what this defeat means for the plaintiffs' claims. The plaintiffs do not claim that the FAAA or § 7.71 creates a private right of action that will redress the harm that the plaintiffs allegedly suffered. Rather, the plaintiffs ground their claims in state consumer-protection law and the state law of express and implied warranty.

The regulations that the TTB administers are certainly relevant to those claims. Although states may impose labeling requirements that vary from the requirements set forth in § 7.71, *see* 27 C.F.R. § 7.71(a); *cf. Bronco Wine Co. v. Jolly*, 95 P.3d 422, 424–25, 442–58 (Cal. 2004) (upholding California restrictions on the use of the word "Napa" on wine bottles against preemption challenge even where such use was permitted by federal law), the plaintiffs do not dispute that each of the eight states whose law is at issue has in some way incorporated the requirements of § 7.71 into state law. And they agree that five of those eight states have common-law or statutory safe-harbor doctrines that offer defendants some insulation from consumer-protection law for conduct that is authorized by state or federal law. *See* Appellant Br. 29; *see also* Colo. Rev. Stat. § 6-1-106(1)(a); Fla. Stat. 501.212(1); Ohio Rev. Code Ann. § 1345.12(A); *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 541–42 (Cal. 1999); *Grace v. St. Louis County*, 348 S.W.3d 120, 127 (Mo. Ct. App. 2011) (per curiam).

Accordingly, in order to succeed on their claims in the face of regulatory authorization of Anheuser-Busch's conduct at the state and federal levels, the plaintiffs would have to show that the safe-harbor provisions do not apply to those regulations (or at least that the safe harbors protect Anheuser-Busch from only consumer-protection law, not warranty law). If the plaintiffs were to overcome that hurdle in those states where it exists, they would also have to show that, under the relevant rules of statutory construction, Anheuser-Busch's compliance with state labeling regulations does not preclude the plaintiffs' state-law consumer-protection and warranty claims.

On appeal, the plaintiffs argue that they can meet these requirements. They argue that "compliance with the TTB regulation does not entitle [Anheuser-Busch] to a 'safe harbor' defense under state law," Appellant Br. 28, because each state's safe harbor "requir[es] clear indication that the State has affirmatively authorized particular conduct before [creating] immunity" from state consumer-protection law, *id.* at 29. As for the warranty claims, the plaintiffs draw upon the proposition that "absent any indication of legislative intent that one statutory scheme displace[s] the other, both statutes apply" and argue no such intent to displace state warranty law exists. *Id.* at 26. Although we agree that the question of whether compliance with § 7.71 protects Anheuser-Busch from more general state consumer-protection or warranty law is a question of state law, we have no occasion to analyze the state safe-harbor provisions or consider whether state labeling regulations preclude state consumer-protection or warranty law because the plaintiffs failed to properly raise this argument in the district court.

The district court dismissed the plaintiffs' action after holding that § 7.71 does not prohibit the behavior in which Anheuser-Busch is allegedly involved. The court reasoned that because each of the eight states has adopted the tolerance set forth in § 7.71(c)(1), and because

"universally accepted principles of statutory construction require courts to apply the more specific provision of la[w] whenever a specific provision and general provision of the law are in conflict," those eight states would not "enforce general legislation that would prohibit conduct specifically permitted under this tolerance provision." The court observed that Anheuser-Busch "has asserted, and Plaintiffs have not contested, that if the Court finds that Anheuser-Busch's alleged over-reporting of alcohol content is permitted under 27 C.F.R. § 7.71(c), this action must be dismissed." After reviewing the parties' submissions to the district court, we agree.

## A

The question of whether a litigant has forfeited an argument is a mixed question of law and fact. *Karam v. Sagemark Consulting, Inc.*, 383 F.3d 421, 426 (6th Cir. 2004). We review any determination of underlying facts for clear error and then "make a de novo determination of whether those facts constitute legal [forfeiture]." *Ibid.* If we conclude that a party has forfeited an argument in a civil case, we do not review the argument except in "exceptional" circumstances where our failure to review the argument "would produce a plain miscarriage of justice." *In re Morris*, 260 F.3d 654, 664 (6th Cir. 2001) (quoting *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1461 (6th Cir. 1988)); *see also Singleton v. Wulff*, 428 U.S. 106, 121 (1976).

We "have not 'articulated precisely' what a party must do (or how much it must say) in the district court to 'raise' an argument." *United States v. Huntington Nat'l Bank*, 574 F.3d 329, 332 (6th Cir. 2009) (quoting *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008)). Nevertheless, our decisions shed some light on what is required. At a bare minimum, a litigant must give the court and opposing parties notice of his position, along with "some minimal level of argumentation in support" of that position. *Ibid.* In other words, "[i]ssues adverted to in a

perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed [forfeited]. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (third alteration in original) (quoting *Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n*, 59 F.3d 284, 293–94 (1st Cir. 1995)). With this in mind, we turn to the parties' briefing below.

Throughout the course of the litigation in the district court, Anheuser-Busch unambiguously took the position that if the district court were to conclude that § 7.71 permits Anheuser-Busch to target the lower end of the tolerance set forth in Paragraph (c)(1), the rule that specific provisions take precedence over more general ones required the court to dismiss all of the plaintiffs' claims. In a memorandum of law accompanying its motion to dismiss, Anheuser-Busch argued that "Plaintiffs' general consumer protection and warranty claims conflict with the specific regulations that govern beer labels that permit a 0.3% variance. This conflict must be resolved in favor of the regulations specific to alcohol content labeling. . . . Any contrary holding is proscribed by this basic tenet of statutory construction." Likewise, in its reply to the plaintiffs' memorandum in opposition, Anheuser-Busch argued that the "entire Complaint should be dismissed" for the "globally dispositive reaso[n]" that "[Anheuser-Busch's] labeling complies with Section 7.71 and therefore cannot form the basis of any claim for false labeling or breach of warranty." And in its supplemental briefing, Anheuser-Busch observed that "Plaintiffs' counsel conceded (again) at oral argument that 27 C.F.R. § 7.71 governs disposition of these cases. . . . Accordingly, if the Court concludes that Section 7.71 does not include an intent exception, then this case is over."

If the plaintiffs felt otherwise, one would have expected them to vigorously contest Anheuser-Busch's claims by informing the district court of their disagreement. But the plaintiffs never did so in any of their written submissions to the district court. If anything, the plaintiffs' briefing suggested that they agreed with Anheuser-Busch's position: In their response to Anheuser-Busch's motion to dismiss, the plaintiffs opened by observing that "the relationship between [§ 7.29(a)(1) and § 7.71] is a key issue in this case." Later in that response, the plaintiffs wrote that "[t]he principal issue to be resolved in this motion is the proper construction of [§ 7.71]; in particular, what is the meaning to be assigned the word 'tolerance' in the context of this provision and the overall regulatory scheme."

To be sure, the plaintiffs did argue that they sufficiently pleaded state-law claims and stated that their warranty claims created a matter for a jury. But given that Anheuser-Busch raised a litany of arguments that the plaintiffs' state-law claims would fail for a variety of reasons even if § 7.71 were to forbid intentionally targeting the lower end of the regulatory tolerance, the district court reasonably assumed that the relevance of the plaintiffs' arguments about those claims necessarily depended upon an antecedent ruling that Anheuser-Busch violated § 7.71. Nothing alerted Anheuser-Busch or the district court that the plaintiffs meant anything else, even after Anheuser-Busch so explicitly stated that "Plaintiffs' counsel conceded . . . that 27 C.F.R. § 7.71 governs disposition of these cases." In other words, what was missing from the plaintiffs' briefing was the argument that they make on appeal, namely, that even if Anheuser-Busch complied with § 7.71, the plaintiffs' state-law and MMWA claims would survive.

The plaintiffs came close to making this argument twice. First, in their memorandum in opposition to Anheuser-Busch's motion for summary judgment, the plaintiffs argued that "[a]t least two courts have relied on the NIST Handbook to conclude that intentional manipulation or

misstatement, even if within a permitted 'tolerance,' is not allowed." Second, in a footnote in their supplemental briefing, the plaintiffs wrote: "Even assuming *arguendo* that Section 7.71(c) permits [Anheuser-Busch] to intentionally label its products 0.3% above the actual ABV, that would just mean that the labels are not 'false' within that specific regulation." The plaintiffs contend on appeal that these excerpts clearly show that they argued that their claims would survive an intent-neutral interpretation of § 7.71.

Context reveals that the plaintiffs included the first statement—which references the NIST Handbook—as part of their argument for an intent-based reading of the regulation, not as part of an argument that their state-law claims would survive irrespective of how the court might interpret § 7.71. That first statement is taken from a part of the plaintiffs' memorandum in opposition that argued that the word "tolerance" in § 7.71(c) is a term of art that does not provide safe harbor to brewers where the variance from the stated alcohol content is intentional.

The second statement—from the plaintiffs' supplemental briefing—is more equivocal. It could plausibly be interpreted as an argument that even if § 7.71 allows Anheuser-Busch's conduct, compliance with § 7.71 does not resolve the issue of whether the manufacturer's labels are misleading as a matter of state law. But this is doubtful, since the plaintiffs offered no response to Anheuser-Busch's conspicuous allegation that they expressly waived that argument in an oral hearing before the district court. Such an interpretation is also hard to square with the plaintiffs' claim that "[t]he principal issue to be resolved in this motion is the proper construction of [§ 7.71]." Because the footnote relies on *Lopez v. Nissan North America, Inc.*, 135 Cal. Rptr. 3d 116 (Cal. Ct. App. 2011), which sets forth an intent-based reading of a tolerance provision in California law, *see id.* at 122–26, it is more likely that the plaintiffs sought to argue that whatever § 7.71(c) means at the federal level, it took on an intent-based gloss when incorporated into state

law, a proposition that they allude to on appeal. *See* Appellant Br. 23 ("[T]he States' adoption of [Handbook 44]'s provisions provides critical insight into the States' view of the intentional abuse of 'tolerances' . . . ."). That claim, which we reject, *see supra* § III.B, would not have preserved the plaintiffs' consumer-protection and warranty claims for appeal, since the claim is entirely consistent with Anheuser-Busch's position that compliance with the relevant "state regulations cannot provide the basis for liability" in this case due to "basic rules of statutory construction."

Where, as here, a litigant has failed to clearly raise an argument in the district court, we have concluded that the argument is forfeited. *See, e.g.*, *Bldg. Serv. Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway*, 46 F.3d 1392, 1398–99 (6th Cir. 1995); *Sigmon Fuel Co. v. Tenn. Valley Auth.*, 754 F.2d 162, 164 (6th Cir. 1985). Nor would a different result obtain even if we were to interpret the plaintiffs' footnote as raising the argument they seek to make on appeal. We have repeatedly held that "the perfunctory manner in which [an] argument was presented below" may constitute a forfeiture of that argument. *Moorer v. Baptist Mem'l Health Care Sys.*, 398 F.3d 469, 487 (6th Cir. 2005). An observation in a footnote, for example, is not sufficient. *See Noble v. Chrysler Motors Corp.*, 32 F.3d 997, 1002 (6th Cir. 1994). And as a "matter of litigation fairness," we have considered arguments raised for the first time in reply briefs to be forfeited, since "the [opposing] party ordinarily has no right to respond to the reply." *Scottsdale Ins. Co.*, 513 F.3d at 553 (quoting *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002)). We see no reason, then, why an argument raised for the first time in a footnote in a supplemental brief should be considered properly raised.

B

The plaintiffs argue that we should nevertheless consider the argument that their state-law claims survive our construction of § 7.71 because the "'rule' against appellate consideration of

25

arguments presented for the first time on appeal is not jurisdictional." Appellant Reply Br. 7. The plaintiffs are correct that our prohibition against raising new arguments on appeal in civil cases is not without exception. *In re Morris*, 260 F.3d at 664. Invoking what we have dubbed the *Pinney Dock* exception, *see Pinney Dock*, 838 F.2d at 1461, we have very rarely excused a litigant's failure to raise an argument in the district court when the interests of justice so required. *See In re Morris*, 260 F.3d at 664. However, we have taken care not to make a habit of invoking the exception, since our "function is to review the case presented to the district court, rather than a better case fashioned after a district court's unfavorable order." *Hall v. Warden*, 662 F.3d 745, 753 (6th Cir. 2011) (quoting *DaimlerChrysler Corp. Healthcare Benefits Plan v. Durden*, 448 F.3d 918, 922 (6th Cir. 2006)).

As the plaintiffs point out, we have invoked the *Pinney Dock* exception and found "extraordinary circumstances" where the question "present[ed] a purely legal issue not available . . . below, and failure to consider it could result in a miscarriage of justice." *United States v. Real Property Known & Numbered as 429 S. Main St.*, 52 F.3d 1416, 1419 (6th Cir. 1995); *see also, e.g.*, *United States v. Chesney*, 86 F.3d 564, 567–68 (6th Cir. 1996). Drawing on these cases, the plaintiffs argue that we should use our discretion to consider their forfeited argument on appeal because the Supreme Court's opinion in *POM Wonderful* was not available to them when they argued their case to the district court.

In *POM Wonderful*, the Supreme Court considered whether Coca-Cola's compliance with regulations adopted pursuant to the Federal Food, Drug, and Comestic Act ("FDCA")—which forbids the misbranding of food, 21 U.S.C. §§ 331(a), 343—prevented POM Wonderful from pursuing a claim against Coca-Cola under Section 43 of the Lanham Act—which authorizes one competitor to sue another if the plaintiff competitor alleges unfair competition arising from the

26

defendant's misleading product descriptions, 15 U.S.C. § 1125(a). Notably, the Court expressly rejected Coca Cola's argument that compliance with the specific regulations of the FDCA precludes challenges under the Lanham Act. *See POM Wonderful*, 134 S. Ct. at 2237–38. The Court had no occasion to apply the canon of *lex specialis derogat legi generali* because the statutes, each of which "has its own scope and purpose," do not cover the same regulatory field and do not conflict. *Id.* at 2238. On the contrary, because "[t]he Lanham Act and the FDCA complement each other in major respects," the Court found no barrier to allowing POM Wonderful's Lanham Act claim to go forward. *Ibid.*

On the plaintiffs' view, the methodology in *POM Wonderful* is obviously inconsistent with the district court's conclusion that, "[h]aving adopted the tolerance set forth in 27 C.F.R. § 7.71(c), th[e] states [whose law is at issue] cannot enforce the general legislation that would prohibit conduct specifically permitted under this tolerance provision." The plaintiffs contend that because the Supreme Court decided *POM Wonderful* only after the district court ruled on Anheuser-Busch's motion to dismiss, and because *POM Wonderful* is inconsistent with the district court's reasoning, "extraordinary circumstances" exist that should excuse their failure to properly raise their forfeited argument. But because ample appellate authority would have supported the plaintiffs' forfeited argument even before the Supreme Court decided *POM Wonderful*, and because *POM Wonderful*'s relevance to this case is merely speculative, we disagree.

i

In cases where we have excused a litigant's failure to raise "a purely legal issue not available . . . below," *429 S. Main St.*, 52 F.3d at 1419, the litigants could not have easily made the relevant arguments before the district court without an intervening statute or decision of

27

appellate authority. *See, e.g.*, *United States v. Henry*, 429 F.3d 603, 618–19 (6th Cir. 2005); *Chesney*, 86 F.3d at 568; *429 S. Main St.*, 52 F.3d at 1419. By contrast, nothing prevented the plaintiffs in this case from making an argument that the interpretive principles of the Supreme Court required the district court to consider the plaintiffs' state-law claims even after concluding that Anheuser-Busch did not violate § 7.71.

Interpretive rules are not binding law. *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001). Instead, "[t]hey are guides that 'need not be conclusive'" in every case where they may apply. *Ibid.* (quoting *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001)). What this means is that the Supreme Court's embrace of *lex specialis* in cases that the district court cited, *see, e.g.*, *Morales*, 504 U.S. at 384—and the Court's subsequent holding that that principle should not govern in *POM Wonderful*—was and is relevant to other cases involving other statutes only insofar as that interpretive approach would "help courts better determine what Congress intended." *Scheidler v. Nat'l Org. for Women*, 547 U.S. 9, 23 (2006); *see also, e.g.*, *RadLAX Gateway Hotel*, 132 S. Ct. at 2072 ("[T]he general/specific canon is not an absolute rule . . . ."). As "the canons of construction are many and their interaction complex," *Xilinx, Inc. v. Comm'r*, 598 F.3d 1191, 1196 (9th Cir. 2010), it is no surprise that the plaintiffs could have drawn on federal case law to make the argument that interpretive principles required the district court to consider their claims even if Anheuser-Busch never violated § 7.71. *See, e.g.*, *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 566–67 (1987) ("There is no basis for assuming that allowing FELA actions for emotional injury will wreak havoc with the general scheme of RLA arbitration, and absent an intolerable conflict between the two statutes, we are unwilling to read the RLA as repealing any part of the FELA." (footnote omitted)); *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 610 (6th Cir. 2004) ("Consistent with th[e] principle of

construction [announced in *Atchison, Topeka & Santa Fe Railway Co.*], federal district courts may enforce congressional remedies created by a different federal statute so long as the statute does not conflict with §§ 7 or 8 of the NLRA . . . .").

While the plaintiffs chose not to invoke any of these precedents in the district court, they are not correct that they could not have done so without *POM Wonderful*.

ii

This leaves the plaintiffs to argue that even if they could have drawn on other principles of interpretation, *POM Wonderful* announced a new canon of construction that would have been determinative in their case. As the plaintiffs put it, "this appeal should be decided based on the law as it is now understood (in light of *POM Wonderful*), not as it was understood at the time of the District Court's order and judgment." Appellant Reply Br. 11. But even if we assume that the interpretive principle in *POM Wonderful* was in fact novel, the plaintiffs' argument is not relevant here for yet another reason: *POM Wonderful* is a decision that instructs courts about how to interpret the interaction between the Lanham Act and the FDCA, two *federal* statutes. While we must pay close attention to the interpretive principles of the Supreme Court when interpreting federal law, those principles are relevant to the plaintiffs' state-law and derivative MMWA claims only if the relevant state courts would find them persuasive as a matter of state law.

It makes sense that state and federal courts interpreting federal law should look to federal interpretive practices for insight into congressional intent. The Supreme Court, which exercises the authority to correct any errors in how lower courts apply federal law, seeks to ensure "that Congress [is] able to legislate against a background of clear interpretive rules, so that it may know the effect of the language it adopts." *Finley v. United States*, 490 U.S. 545, 556 (1989).

29

Accordingly, when called upon to analyze issues of federal statutory law analogous to the interpretive question that the Court faced in *POM Wonderful*, it is no surprise that many state courts have followed the Supreme Court's interpretive methodology. *See Fair v. BNSF Ry. Co.*, 189 Cal. Rptr. 3d 150, 152–53 (Cal. Ct. App. 2015); *Noice v. BNSF Ry. Co.*, 348 P.3d 1043, 1048–49 (N.M. Ct. App. 2015); *Trout v. Grand Trunk W. R.R. Co.*, No. 312727, 2014 WL 4792201, at *10–11 (Mich. Ct. App. Sept. 25, 2014) (per curiam). But when it comes to issues of state law, some state courts and legislatures have developed their own interpretive practices that may differ from those of the federal courts. *Compare, e.g.*, *Bailey v. Lampert*, 153 P.3d 95, 98 (Or. 2007) ("Assuming that the rule ever truly existed [in Oregon], . . . the legislature has eliminated the availability of any 'rule of lenity' by statute."), *with, e.g.*, *United States v. Millis*, 621 F.3d 914, 916–17 (9th Cir. 2010) ("We begin by noting that the rule of lenity 'requires courts to limit the reach of criminal statutes to the clear import of their text and construe any ambiguity against the government.'" (quoting *United States v. Romm*, 455 F.3d 990, 1001 (9th Cir. 2006))). Because we assume that legislators legislate against the backdrop of a judicial system's interpretive principles, *see In re Sanders*, 551 F.3d 397, 404 (6th Cir. 2008), it follows that we, too, should bear state interpretive practices in mind when interpreting state statutes and regulations.

Since all of the plaintiffs' claims in this case depend upon whether state beverage-labeling law precludes state consumer-protection and warranty law, the interpretive methodology set forth in *POM Wonderful* would be relevant only insofar as the relevant state courts would find the case persuasive as a matter of state law. *See Batterton v. Tex. Gen. Land Office*, 783 F.2d 1220, 1222 (5th Cir. 1986) ("[I]n deriving a meaning from the [Texas] statute's words, we should approach them exactly as would a Texas court . . . . It would make little sense for us

to proceed to an aberrant construction by refusing to apply state canons, canons which will in all probability govern any authoritative construction which the statute ever receives.").

This reality has two implications for the plaintiffs' forfeited argument, neither of which militates in favor of considering that argument on appeal. Since state courts may employ interpretive principles that diverge from federal ones, the plaintiffs' contention that *POM Wonderful* "changed the law" is speculative. The plaintiffs' argument is particularly questionable since some state high courts have employed interpretive principles that are arguably at odds with the plaintiffs' reading of *POM Wonderful*. *See, e.g.*, *Maggio v. Fla. Dep't of Labor & Emp't Sec.*, 899 So. 2d 1074, 1079 (Fla. 2005) ("Given these specific presuit requirements, we see no basis for concluding that the Legislature also intended a civil rights claimant to be bound by . . . a broader provision applying to tort actions that requires notice within three years of the date the claim accrues. Moreover, a 'specific statute covering a particular subject area always controls over a statute covering the same and other subjects in more general terms.'" (quoting *Stoletz v. State*, 875 So. 2d 572, 575 (Fla. 2004))).

The upshot of this is that the plaintiffs could have drawn on *state* appellate authority to argue that Anheuser-Busch's compliance with § 7.71 does not preclude particular state-law consumer-protection or warranty claims. Although we do not opine on the merits of such an argument, we do point out that since at least some of the courts of the eight states in question appear to have endorsed the very principle that the Supreme Court found conclusive on the facts before it in *POM Wonderful*, *see, e.g.*, *People v. Price*, 821 P.2d 610, 640 (Cal. 1991) (en banc) ("Two statutes dealing with the same subject are given concurrent effect if they can be harmonized, even though one is specific and the other general."), this argument was certainly available to the plaintiffs in the district court.

iii

*POM Wonderful* did not change the law, except insofar as it determined how courts must apply the Lanham Act as it interacts with the FDCA. Nothing prevented the plaintiffs from raising in the district court the very argument that they seek to make for the first time on appeal. On the contrary, ample appellate authority would have enabled them to make that argument. Accordingly, no "extraordinary circumstances" exist that would warrant excusing the plaintiffs' failure to properly raise their argument in the district court. We are not a "'second shot' forum, a forum where secondary, back-up theories may be minted for the first time." *Estate of Quirk v. Comm'r*, 928 F.2d 751, 758 (6th Cir. 1991) (quoting *Anschutz Land & Livestock Co. v. Union Pac. R.R. Co.*, 820 F.2d 338, 344 n.5 (10th Cir. 1987)). Instead, we rely on the district courts' "valued judgment," which "adds much to the deliberative process and allows this court its proper function—to determine if an erroneous decision was made as to the issues presented." *Taft Broad. Co. v. United States*, 929 F.2d 240, 245 (6th Cir. 1991). Because a contrary holding would subvert the goal of finality in civil litigation and disrupt the orderly functioning of the judicial process in future cases, *cf. Foster*, 6 F.3d at 407, we decline to consider the plaintiffs' new argument on appeal.

V

We conclude that the district court properly determined that nothing in the FAAA or corresponding regulations prohibits Anheuser-Busch from targeting the lower end of the tolerance specified in 27 C.F.R. § 7.71(c)(1). Because the plaintiffs forfeited the argument that their claims survive such an interpretation of § 7.71, we have no occasion to consider the merits of that argument. Accordingly, the judgment of the district court is AFFIRMED.