NOT RECOMMENDED FOR PUBLICATION
File Name: 19a0210n.06

No. 18-5599

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

CHRISTOPHER BOLING,

      Plaintiff-Appellee,

v.

PROSPECT FUNDING HOLDINGS, LLC,

      Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)

FILED
Apr 25, 2019
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE WESTERN
DISTRICT OF KENTUCKY

BEFORE: COLE, Chief Judge; BOGGS and GIBBONS, Circuit Judges.

BOGGS, Circuit Judge. Prospect Funding Holdings, LLC ("Prospect") appeals from several district-court judgments that denied its motion to dismiss for *forum non conveniens*; granted summary judgment for Appellee Christopher Boling ("Boling") regarding his choice of forum, and the applicable law; and granted summary judgment for Boling on the question of whether the litigation-funding agreements that Prospect and Boling entered into violated Kentucky's statutory prohibitions on champerty and usury. We affirm the district court's judgment.

## I. FACTUAL BACKGROUND

Boling was seriously injured in 2008 when vapors escaping from a gas can ignited after they came into contact with a hot metal eye bolt. He and his then-wife, Holly Boling,[1] filed suit against Blitz USA, the company that manufactured the can, in May 2009. Over the course of the litigation, Boling entered into four agreements ("Agreements"), the first two with Cambridge Management Group, LLC ("Cambridge"), and the later two with Prospect to borrow money, secured by Boling's recovery from Blitz USA. In 2013, Cambridge assigned its rights under the first two Agreements to Prospect. Each of the Agreements provided that Boling was not required to repay the loans unless he recovered money from the personal-injury lawsuit. The agreements may be summarized as follows:

| Date | Lender | Amount and Fees |
|------|--------|-----------------|
| October 2009 ("2009 Agreement") | Cambridge | $10,000 and fees of $1,275 |
| March 2010 ("2010 Agreement") | Cambridge | $5,000 and fees of $525 |
| May 2012 ("2012 Agreement") | Prospect | $5,000 and fees of $1,025 |
| April 2013 ("2013 Agreement") | Prospect | $10,000, and fees of $1,800 |

Each agreement provided that the loans accrued interest at a rate of 4.99% per month. The interest was to be compounded monthly, which (according to the district court) created an effective annual rate of interest at 79.38%.

The Agreements collectively have four different forum-selection clauses and three choice-of-law clauses. The 2009 Agreement provided that:

> any and all disputes that arise concerning the terms, conditions, interpretation or enforcement of this Agreement shall be determined through arbitration pursuant to the Rules and methods outlined by

---

[1] Holly Boling is not a party to this action because, under the terms of the Bolings' divorce, Boling's recovery for his personal injury is considered his non-marital property. *Boling v. Prospect Funding Holdings, LLC*, No. 1:14-cv-00081-GNS-HBB, 2015 WL 5680418, at *1 n.1 (W.D. Ky. Sept. 25, 2015) ("*Boling I*").

> the American Arbitration Association in New Jersey, or in a Court of competent jurisdiction, at the election of [Cambridge] or Plaintiff. Plaintiff agrees that the laws of the State of New Jersey shall control the interpretation of this Agreement.

The 2010 Agreement's forum-selection clause was identical—except that it omitted the words "or Plaintiff." It also provided that New Jersey law controlled interpretation of that Agreement.

The 2012 Agreement selected Minnesota law to control interpretation of that Agreement. It provided that "all actions or proceedings in any way, manner or respect, arising out of or related to this agreement shall be litigated only in courts having situs in Hennepin County, Minneapolis, Minnesota." The 2013 Agreement selected New York law to control its interpretation. Its forum-selection provision, in language similar to the 2012 Agreement, selected "courts having situs in New York County, New York." Neither of these Agreements provided for arbitration.

In May 2014, Boling resolved the lawsuit against Blitz USA. Prospect sent Boling a "Schedule of Purchases" asserting that Boling owed Prospect (as of August 2014) $340,405.[2]

## II. PROCEDURAL HISTORY

In June 2014, Boling filed suit against Prospect in the Western District of Kentucky, seeking a declaratory judgment that the four Agreements were void and unenforceable under Kentucky statutes prohibiting champerty and usury. In August 2014, Prospect filed suit in the Superior Court of New Jersey, Chancery Division, seeking to compel arbitration. Boling removed the suit to federal district court in New Jersey. The federal court in New Jersey refused to exercise jurisdiction based on the first-to-file rule and transferred the case to the Western District of Kentucky. *Boling v. Prospect Funding Holdings, LLC*, No. 1:14-cv-00081-GNS-HBB, 2015 WL 5680418, at *5 (W.D. Ky. Sept. 25, 2015) ("*Boling I*"); *see also Prospect Funding Holdings, LLC*

---

[2] The district court calculated that, as of March 2017, the outstanding balance on the four Agreements totaled approximately $1.5 million. *Boling v. Prospect Funding Holdings, LLC*, No. 1:14-cv-00081-GNS-HBB, 2017 WL 1193064, at *1 n.4 (W.D. Ky. Mar. 30, 2017) ("*Boling III*").

*v. Boling*, No. 2:14-cv-6169-SDW-SCM, 2015 WL 5095155, at *1–2 (D.N.J. Aug. 26, 2015) (denying motion for reconsideration).

In the Western District of Kentucky, Prospect filed a motion to dismiss asserting, *inter alia*, that the district court should dismiss the case for *forum non conveniens*, and that New Jersey was an appropriate alternative forum. Boling responded with a motion for partial summary judgment on the grounds that the forum-selection and choice-of-law provisions were invalid, and that Kentucky law controlled the dispute. The district court denied Prospect's motion to dismiss and granted in part Boling's motion for partial summary judgment. *Boling I*, 2015 WL 5680418, at *1. The court ruled that under the forum-selection clause in the 2009 Agreement, Boling was entitled to file suit in the Western District of Kentucky. *Id.* at *6–7. Because the Agreements contained four different forum-selection clauses, the district court concluded that it could decline to enforce all of them in the interest of conserving judicial and party resources. *Id.* at *7. The court also determined that it would apply Kentucky law to determine the enforceability of the Agreements. *Id.* at *7–8. Prospect filed a motion for reconsideration, which the district court denied. *Boling v. Prospect Funding Holdings, LLC*, No. 1:14-cv-00081-GNS-HBB, 2016 WL 1611383, at *1 (W.D. Ky. Apr. 21, 2016) ("*Boling II*").

Prospect answered Boling's complaint and asserted counterclaims for breach of contract, unjust enrichment, promissory estoppel, breach of the duty of good faith and fair dealing, negligent misrepresentation, and conversion. Boling renewed his motion for summary judgment, arguing that the Agreements violated Kentucky's statutory prohibition on champerty, and that the interest rate in the Agreements was usurious. Prospect opposed Boling's renewed motion and filed its own motion for summary judgment arguing that Boling had breached the contract. The district court concluded that the Supreme Court of Kentucky would likely find that the Agreements violated

Kentucky's public policy and the statute prohibiting champerty. *Boling v. Prospect Funding Holdings, LLC*, No. 1:14-cv-00081, 2017 WL 1193064, at *6 (W.D. Ky. Mar. 30, 2017) ("*Boling III*"). The district court examined the interest rates in the Agreements and found that, because the effective annual rate of interest was 79.38%, it violated Kentucky's anti-usury statute. *Id.* at *7. Accordingly, the district court granted Boling's renewed motion for summary judgment and denied Prospect's cross-motion for summary judgment. *Id.* at *8.

Boling filed a third motion for summary judgment to dismiss Prospect's remaining counterclaims, as well as a motion for sanctions. Prospect cross-moved for summary judgment on the remaining counterclaims. The district court dismissed Boling's claim for sanctions and Prospect's claims for negligent misrepresentation, conversion, and breach of the duty of good faith and fair dealing. *Boling v. Prospect Funding Holdings, LLC*, 324 F. Supp. 3d 887, 897–99 (W.D. Ky. 2018) ("*Boling IV*"). The district court entered judgment in Prospect's favor against Boling on Prospect's unjust enrichment and promissory estoppel claims in the amount of $34,625,[3] representing the principal of the original loan and costs.[4] *Id.* at 896–97. This appeal followed.[5]

### III. ANALYSIS

Prospect asserts that the district court made three errors in *Boling I*. First, it argues that the district court should have granted its motion to dismiss or transfer the case. Second, Prospect claims that the district court erroneously concluded that the forum-selection clause in the 2009

---

[3] The district court held that promissory estoppel required Boling to pay Prospect the principal, $30,000 plus $4,625 in fees. *See Boling IV*, 324 F. Supp. 3d 887, 897 (W.D. Ky. 2018). Later in the opinion the district court identified the amount as $34,425. The four Agreements reflect that $34,625 is the correct amount.

[4] Boling has not appealed the district court's award to Prospect.

[5] After the district court's ruling in *Boling IV*, Prospect sued Boling's attorney, Michael Breen, in the District of New Jersey, alleging breach of contract, breach of fiduciary duty, conversion, breach of the duty of good faith and fair dealing, and promissory estoppel. *Prospect Funding Holdings, LLC v. Breen*, No. 2:17-CV-3328-KM-MAH, 2018 WL 734665, at *4 (D.N.J. Feb. 5, 2018). The district court dismissed the case for issue preclusion in light of *Boling III* and *IV*. *Id.* at *8. The Third Circuit affirmed. *See Prospect Funding Holdings, LLC v. Breen*, 757 F. App'x 130, 131 (3d Cir. 2018).

Agreement permitted Boling to sue in the Western District of Kentucky. Third, Prospect contends that the district court improperly concluded that it would apply Kentucky law to all four agreements. Prospect also claims that, even if *Boling I* was correct, the district court erred in *Boling III*, when it held that all four Agreements were unenforceable because they violated Kentucky statutes prohibiting champerty and usury. Prospect asks us to reverse the district court's determination as to forum, vacate its subsequent orders and rulings, and remand the case with instructions to transfer or dismiss Boling's claims. We begin with the district court's determination on the forum-selection clauses.

## A. Forum-Selection Clauses

The district court denied Prospect's motion to dismiss or transfer the case under *forum non conveniens*. It deferred to Boling's choice of forum. Relying in part on its conclusion that it had personal jurisdiction over Prospect, the district court found that there was no "oppression or vexation" to Prospect by keeping the case in the Western District of Kentucky. *Boling I*, 2015 WL 5680418, at *5. The district court also granted Boling's motion for partial summary judgment and concluded that the 2009 forum-selection clause allowed Boling to choose the Western District of Kentucky as a forum. *Id.* at *6. The district court then held that, because enforcing all four forum-selection clauses would result in the same parties litigating the same claims across multiple forums, it would retain jurisdiction "for purposes of judicial economy and to avoid inconsistent results . . . ." *Ibid.*

Prospect argues that each of the four forum-selection clauses is enforceable, and that, under *Atlantic Marine Constr. Co. v U.S. Dist. Court for the W. Dist. of Tex.*, 571 U.S. 49 (2013), the district court should have evaluated and enforced each clause separately, splitting the claims across litigation and arbitration in New Jersey and litigation in Minnesota and New York. Prospect

contends that the district court improperly placed the burden on it to prove that the clauses should be enforced.

Boling asserts that the 2009 Agreement, as drafted, permitted Boling to select a forum, provided it was a "court of competent jurisdiction," and the Western District of Kentucky satisfies that criteria. Therefore, Boling reasons, the district court did not need to bother with the *Atlantic Marine* analysis because Boling was in the proper forum, and the district court could retain jurisdiction over all the claims in the interests of judicial economy. Boling points out that Prospect did not ask the district court to apply *Atlantic Marine* or split the litigation across multiple forums. Instead, Boling notes, Prospect consistently maintained that New Jersey was the proper venue for all claims.

Under 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." A district court ruling on a motion to transfer under 28 U.S.C. § 1404(a) should consider "the private interests of the parties, including their convenience and the convenience of potential witnesses," public-interest concerns, as well as whether the transfer is in the interests of justice. *Moses v. Bus. Card Express Inc.*, 929 F.2d 1131, 1137 (6th Cir. 1991). This provision is "a mechanism for enforcement of forum-selection clauses that point to a particular federal district." *Atlantic Marine*, 571 U.S. at 59.

If, however, a forum-selection clause indicates that a matter should be heard by a state or foreign court, then *forum non conveniens* is the appropriate method of enforcement. *Id.* at 60–61. *Forum non conveniens* permits a court to decline to exercise jurisdiction even when jurisdiction is proper. *Hefferan v. Ethicon Endo-Surgery Inc.*, 828 F.3d 488, 492 (6th Cir. 2016). Section 1404(a)

codifies "the doctrine of *forum non conveniens* for the subset of cases in which the transferee forum is within the federal court system; in such cases, Congress has replaced the traditional remedy of outright dismissal with transfer." *Atlantic Marine*, 571 U.S. at 60. Because both § 1404(a) and *forum non conveniens* "entail the same balancing-of-interests standard, courts should evaluate a forum-selection clause pointing to a nonfederal forum in the same way that they evaluate a forum-selection clause pointing to a federal forum." *Id.* at 61.

Courts should uphold a forum-selection clause unless there is a strong showing that the clause should be set aside. *Wong v. PartyGaming Ltd.*, 589 F.3d 821, 828 (6th Cir. 2009). Federal law governs the enforceability of a forum-selection clause in a diversity suit. *Ibid.* To evaluate whether a forum-selection clause is enforceable, a court must consider: "(1) whether the clause was obtained by fraud, duress, or other unconscionable means; (2) whether the designated forum would ineffectively or unfairly handle the suit; and (3) whether the designated forum would be so seriously inconvenient such that requiring the plaintiff to bring suit there would be unjust." *Ibid.* The party who opposes the enforcement of the forum-selection clause has the burden of showing that the clause should not be enforced. *Ibid.* A valid forum-selection clause will have "controlling weight in all but the most exceptional cases." *Atlantic Marine*, 571 U.S. at 63 (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 33 (1988) (Kennedy, J., concurring)).

*Atlantic Marine* clarified the analysis that applies when a court considers whether it should grant a motion to dismiss for *forum non conveniens* or transfer under § 1404(a) pursuant to an enforceable forum-selection clause. 571 U.S. at 62–65. A typical *forum non conveniens* analysis involves three steps. *Hefferan*, 828 F.3d at 492. First, the court determines the degree of deference owed the plaintiff's forum choice. The defendant must then establish an "adequate alternative forum" and show that "the plaintiff's chosen forum is unnecessarily burdensome based on public

and private interests." *Ibid.* In *Atlantic Marine*, the Supreme Court concluded that an enforceable forum-selection clause alters this analysis in three important ways. 571 U.S. at 63. First, the plaintiff's choice of forum no longer receives any weight. Instead, the plaintiff must show why the court should not transfer the case to the selected forum. *Ibid.* Second, the court should only consider arguments about public-interest factors,[6] and not the parties' private interests.[7] *Id.* at 64. Public-interest factors, the Court observed, will "rarely defeat a transfer motion," and thus the "practical result" is that forum-selection clauses will almost always control. *Ibid.* Third, when a party bound by a forum-selection clause files suit in a different forum, the transfer of venue will *not* carry the original venue's choice-of-law rules. *Ibid.*

We typically review a district court's *forum non conveniens* determination for abuse of discretion. *Hefferan*, 828 F.3d at 493. The enforceability of a forum-selection clause, however, is a question of law that we review *de novo*. *Wong*, 589 F.3d at 826; *Preferred Capital, Inc. v. Assocs. in Urology*, 453 F.3d 718, 721 (6th Cir. 2006). A district court's grant of summary judgement is also reviewed *de novo*. *Mutchler v. Dunlap Mem'l Hosp.*, 485 F.3d 854, 857 (6th Cir. 2007). Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We draw all reasonable inferences in favor of the party opposing summary judgment. *Mutchler*, 485 F.3d at 857.

---

[6] Public interest factors include "the administrative difficulties flowing from court congestion; the 'local interest in having localized controversies decided at home'; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947)).

[7] Factors relating to litigants' private interests include the "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious, and inexpensive." *Piper Aircraft Co.*, 454 U.S. at 241 n.6 (quoting *Gilbert*, 330 U.S. at 508).

*De novo* review does *not*, however, mean that parties can raise arguments that were not made before the district court. We have not "'articulated precisely' what a party must do (or how much it must say) in the district court to 'raise' an argument." *United States v. Huntington Nat'l Bank*, 574 F.3d 329, 332 (6th Cir. 2009) (quoting *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008)). A party must "give the court and opposing parties notice of his position, along with 'some minimal level of argumentation in support' of that position." *In re Anheuser-Busch Beer Labeling Mktg. & Sales Practices Litig.*, 644 F. App'x 515, 527 (6th Cir. 2016) (quoting *Huntington Nat'l Bank*, 574 F.3d at 332). Failing to do so forfeits the issue. When a party forfeits an argument, we do not review that argument unless in exceptional circumstances where the failure to review the argument would lead to a miscarriage of justice. *Ibid.*

Prospect argues that the 2012 and 2013 Agreements contain mandatory forum-selection clauses establishing Minnesota and New York as the only appropriate fora to litigate those claims.[8] Prospect complains that the district court did not consider whether these clauses were enforceable. A review of the record reveals, however, that Prospect did not ask the district court to enforce the 2012 and 2013 forum-selection clauses, or even cite *Atlantic Marine*.

Prospect's arguments did not provide notice or supply a "minimal level of argumentation" to the district court (or Boling) that Prospect wanted to transfer litigation over the 2012 and 2013 Agreements to Minnesota and New York. *Anheuser-Busch*, 644 F. App'x at 527; *see also Huntington Nat'l Bank*, 574 F.3d at 332. It is true that *Atlantic Marine* indicates that a court should enforce a forum-selection clause absent exceptional circumstances. 571 U.S. at 63. But a litigant must still ask the court for the relief he or she seeks. If Prospect wanted to enforce the 2012 and

---

[8] Our own review of all four Agreements has not revealed a contractual provision stating that one Agreement's terms supersede another's. Prospect has not argued that any provisions of the more recent Agreements superseded a previous Agreement.

2013 forum-selection clauses, then it was incumbent on *Prospect* to ask the district court to do so, instead of arguing that the district court should transfer the matter to New Jersey. It did not. We therefore conclude that Prospect has forfeited its argument to transfer claims to Minnesota and New York. *See GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 817 (6th Cir. 1999) (party forfeited argument about terms of contract when raised for first time on appeal).

The question, therefore, is whether the district court correctly retained jurisdiction over the claims, or whether the district court should have granted Prospect's motion to dismiss or transfer and sent the claims to New Jersey.

We begin with the 2009 forum-selection clause. The district court ruled that Boling was "within his contractual rights" to file suit in the Western District of Kentucky under the 2009 Agreement. *Boling I*, 2015 WL 5680418, at *6. The 2009 Agreement stated that "any and all disputes" that arose from the Agreement "shall be determined through arbitration pursuant to the Rules and methods outlined by the American Arbitration Association in New Jersey, or in a Court of competent jurisdiction, at the election of [Prospect] or [Boling]." Prospect argues that, because the phrase "a Court of competent jurisdiction" follows "arbitration . . . in New Jersey," the reference to New Jersey modifies the "Court of competent jurisdiction." Prospect asserts that the district court's construction "disregards" the use of the word "shall," which evinces an intent that a term is mandatory.[9] Boling insists that the district court correctly interpreted the 2009 forum-selection clause because "'or in a Court of competent jurisdiction' creates a disjunctive that provides an alternative to the proceeding clause." Boling also maintains that the district court

---

[9] Prospect argues that the language of the 2009 forum-selection clause is "not plain and unambiguous," and that the district court should have held an evidentiary hearing to determine the parties' intent. Prospect did not seek an evidentiary hearing on the interpretation of the 2009 forum-selection clause in the district court, and Prospect maintained that it unambiguously designated New Jersey as the forum. Without considering whether Prospect waived these arguments, as Boling asserts, we do not conclude that the clause is ambiguous.

properly did not transfer proceedings to New Jersey because the case could not have been brought there.

The 2009 forum-selection clause permits *either* Prospect *or* Boling to choose between arbitration and litigation. The use of the word "or" is in the disjunctive, creating alternatives. *See GenCorp*, 178 F.3d at 821. It is also evident that if Prospect or Boling chose to arbitrate, then they would do so in New Jersey. *See General Elec. Co. v. Siempelkamp GmbH & Co.*, 29 F.3d 1095, 1099 (6th Cir. 1994). But we do not agree that "New Jersey" modifies "in a Court of competent jurisdiction—that reading is inconsistent with the plain terms of the forum-selection clause. If the forum-selection clause intended to provide that the parties had selected courts in New Jersey— federal or state—as the sole forum, it would have said so. *See, e.g.*, *Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc.*, 807 F.3d 553, 567 (4th Cir. 2015) ("[C]ourt of competent jurisdiction in the State of Maryland . . . ."); *Russell Corp. v. Am. Home Assurance Co.*, 264 F.3d 1040, 1042–43 (11th Cir. 2001) ("[A]ny Court of competent jurisdiction within the United States . . . .").

The phrase "court of competent jurisdiction" has generally been used to refer to both state and federal courts that have subject-matter jurisdiction. *See Lightfoot v. Cendant Mortg. Corp.*, 137 S. Ct. 553, 560–61 (2017); *SunCoke Energy Inc. v. MAN Ferrostaal Aktiengesellschaft*, 563 F.3d 211, 216 (6th Cir. 2009); *Telespectrum, Inc. v. Pub. Svc. Comm'n of Ky.*, 227 F.3d 414, 421 (6th Cir. 2000). This term may also be used to refer to a court's jurisdiction over a defendant's person. *See United States v. Morton*, 467 U.S. 822, 828 (1984). Here, the district court concluded that it had personal jurisdiction over Prospect. *Boling I*, 2015 WL 5680418, at *3. Prospect has not challenged this issue on appeal or argued that the district court lacked subject-matter

jurisdiction. The district court correctly concluded that the forum-selection clause in the 2009 Agreement allowed Boling to file suit in the Western District of Kentucky.

We next consider whether the district court abused its discretion when it denied Prospect's motion to dismiss on *forum non conveniens* grounds with regard to claims arising from the 2009 Agreement. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257 (1981). Dismissal for *forum non conveniens* is justified if the defendant "establishes that an adequate alternative forum is available" and that the "public and private factors . . . demonstrate that the chosen forum is unnecessarily burdensome to a defendant or a district court." *Zions First Nat'l Bank v. Moto Diesel Mexicana, S.A. de C.V.*, 629 F.3d 520, 523 (6th Cir. 2010). In making this determination, a court generally applies a "strong presumption in favor of a plaintiff's selected forum, particularly if the forum is the home of the plaintiff . . . ." *Id.* at 523–24 (citing *Piper Aircraft*, 454 U.S. at 255–56). *Atlantic Marine* altered this analysis when the plaintiff files suit in defiance of a forum-selection clause. *See* 571 U.S. at 63–65. But *Atlantic Marine* does not apply to the 2009 forum-selection clause because, under the terms of that clause, Boling *could* choose to file suit in the Western District of Kentucky.

The Western District of Kentucky is Boling's home forum, and it was reasonable for the district court to assume that the choice was convenient. *See Zions First Nat'l Bank*, 629 F.3d at 523–24 (citing *Piper Aircraft*, 454 U.S. at 255–56). The district court concluded that because it had personal jurisdiction over Prospect, and Prospect had entered into loans with Kentucky residents, that "negate[d] any argument of oppression or vexation in this case remaining in this forum."

The district court also determined that the application of the first-to-file rule, which the district court in New Jersey relied on to transfer the case to Kentucky, demonstrated that it should

retain jurisdiction. *See Boling I*, 2015 WL 5680418, at *5. Like the district court's *forum non conveniens* determination, we review the district court's application of the first-to-file rule for an abuse of discretion. *Baatz v. Columbia Gas Transmission, LLC*, 814 F.3d 785, 789 (6th Cir. 2016). The first-to-file rule provides that "when actions involving nearly identical parties and issues have been filed in two different district courts, 'the court in which the first suit was filed should *generally* proceed to judgment.'" *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 551 (6th Cir. 2007) (emphasis in original) (quoting *Zide Sport Shop of Ohio v. Ed Tobergate Assocs., Inc.*, 16 F. App'x 433, 437 (6th Cir. 2001)). A court assessing the applicability of the first-to-file rule consider three factors: "(1) the chronology of events, (2) the similarity of the parties involved, and (3) the similarity of the issues or claims at stake." *Baatz*, 814 F.3d at 789. A court must also consider "whether any equitable considerations" in the case counsel against application of the rule. *Ibid.* These include bad faith, anticipatory litigation, forum shopping, or inequitable conduct. *See Certified Restoration*, 511 F.3d at 551–52.

The chronology of events requires a comparison of when the relevant complaints were filed. *Baatz*, 814 F.3d at 790. Boling filed his complaint in the Western District of Kentucky on June 19, 2014. Prospect filed its complaint in New Jersey on August 12, 2014. The second factor is easily met because the parties are the same. *See id.* at 790; *Certified Restoration*, 511 F.3d at 551. In considering the "similarity of the issues" we examine whether the issues in the case "substantially overlap." *Baatz*, 814 F.3d at 791. The issues should be materially consistent and have a sufficient relationship that a decision in one case would "leave[] little or nothing to be determined in the other." *Smith v. Sec. & Exch. Comm'n*, 129 F.3d 356, 361 (1997). Here, the parties are litigating four different agreements, but their claims and the relief sought are the same across those agreements. This satisfies the third factor. *See Baatz*, 814 F.3d at 792.

The district court did not make any findings on the equitable factors. *Boling I*, 2015 WL 5680418, at *5. We observe that Boling filed first, seeking a declaratory judgment that the Agreements were unenforceable and void. This Circuit has considered that a first-filed declaratory judgment action weighs somewhat against the application of the first-to-file rule. *See Certified Restoration*, 511 F.3d at 552; *Zide Sport Shop of Ohio, Inc. v. Ed Tobergate Assocs.*, 16 F. App'x 433, 437 (6th Cir. 2001). On the other hand, the forum-selection clause in the 2009 Agreement permitted Boling to choose his forum, which weighs against a finding of forum-shopping. *See Certified Restoration*, 511 F.3d at 552 (concluding that a suit filed in defiance of a forum-selection clause demonstrated forum-shopping and an attempt to "preempt resolution of the parties' dispute by a proper forum"). Under these circumstances, we conclude that the district court did not abuse its discretion by deferring to Boling's choice of forum, applying the first-to-file rule, and denying Prospect's motion to dismiss for *forum non conveniens*. *Boling I*, 2015 WL 5680418, at *5.

The question remains, however, whether the district court should have retained jurisdiction over the claims arising from all the agreements. We can quickly dispose of the 2012 and 2013 Agreements. *Atlantic Marine* does not apply because Prospect never sought to enforce the forum-selection clauses for Minnesota and New York—it argued that the case should be heard in New Jersey. For the reasons discussed above, we conclude that the district court did not abuse its discretion when it denied Prospect's motion to dismiss for *forum non conveniens* with regard to the 2012 and 2013 Agreements.

Consideration of the forum-selection clause in the 2010 Agreement is somewhat more complicated. It contains almost the same language as the 2009 Agreement's clause—that all disputes shall be resolved in arbitration in New Jersey, or in a "court of competent jurisdiction." But the clause omits the reference to "Plaintiff" and leaves the choice between litigation and

arbitration to Prospect. Prospect reasons that, because the clause permits it to choose between arbitration and litigation, and it elected to arbitrate, the district court erred by not considering whether this clause was enforceable and should have granted Prospect's motion to dismiss.

This aspect of the case is in a difficult procedural posture. Prospect's complaint, filed in New Jersey state court, sought to compel arbitration of claims arising from all four Agreements (even those without arbitration clauses). Boling removed the complaint to federal district court in New Jersey, and that court declined jurisdiction on the basis of the first-to-file rule. *See Boling I*, 2015 WL 5680418, at *5. Prospect filed a motion to dismiss in the Western District of Kentucky, not a motion to compel arbitration. Prospect's motion noted the existence of its state-court complaint to compel arbitration and argued that Kentucky was not a proper forum because "two of the agreements require the parties to enter into arbitration to dispose of any issues which arise out of the Agreements." Nonetheless, when discussing *forum non conveniens*, Prospect insisted that the U.S. District Court in New Jersey represented an adequate alternative forum and asked the district court to dismiss or transfer the case there. Boling does not argue that Prospect waived arbitration. Instead, Boling asserts that the district court's decision to retain jurisdiction over the entire case was appropriate because it had already concluded that the 2009 forum-selection clause permitted Boling to litigate in the Western District of Kentucky.

If parties have contracted to arbitrate disputes arising from that contract, and one party moves to compel arbitration, then district courts must grant that motion even when "the result would possibly be inefficient maintenance of separate proceedings in different forums." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217 (1985). Although a party may waive its right to arbitrate, because there is a strong presumption in favor of arbitration, courts do not lightly infer waiver. *Johnson Assocs. Corp. v. HL Operating Corp.*, 680 F.3d 713, 717 (6th Cir. 2012). It is

true that *Boling I* did not analyze whether the 2010 forum-selection clause required the district court to dismiss any claims arising from the 2010 Agreement for arbitration. *See* 2015 WL 5680418, at *6–7. But Prospect's motion to dismiss, which notes the existence of these clauses, did not ask the district court to enforce them, or seek to compel arbitration. Prospect's response to Boling's motion for summary judgment incorporated its motion to dismiss for *forum non conveniens* and did not argue that the 2010 forum-selection clause required arbitration. We do not fault the district court for failing to enforce a portion of the contract when the party now seeking to enforce the agreement did not to ask the district court to do so. *See Anheuser-Busch*, 644 F. App'x at 527 (party forfeits an argument when it refers to it in "the most skeletal way" (quoting *McPherson v. Kelsey*, 125 F.3d 929, 995–96 (6th Cir. 1997))). Under these circumstances, we conclude that the district court did not abuse its discretion in denying Prospect's motion to dismiss for *forum non conveniens*.

We next consider whether the district court erred in *Boling I*, 2015 WL 5680418, at *7–8 when it granted summary judgment to Boling and concluded that it would apply Kentucky law to address the enforceability of all four loan Agreements.

### B. Choice of Law

A federal court sitting in diversity must apply the choice-of-law rules of the state where it is located to resolve conflicts between state laws. *See Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Performance Contracting, Inc. v. DynaSteel Corp.*, 750 F.3d 608, 611 (6th Cir. 2014). We review a district court's choice-of-law determination, as well as its grant of summary judgment *de novo*. *Performance Contracting*, 750 F.3d at 611; *Mutchler*, 485 F.3d at 857.

The 2009 and 2010 Agreements both stated that "the laws of the State of New Jersey shall control the interpretation of this Agreement." The 2012 Agreement selected Minnesota law. The 2013 Agreement specified that New York law applied.

The district court, sitting in Kentucky, applied Kentucky's choice-of-law principles to decide which law applied to the enforceability of the Agreements. *See Boling I*, 2015 WL 5680418, at *7–8. It relied primarily on *Incline Energy, LLC v. Stice*, No. 3:09-CV-58-H, 2009 WL 1975038, at *2 (W.D. Ky. July 6, 2009), which concluded that, under the "most significant relationship" test, Kentucky law, rather than New York law as provided in a choice-of-law clause, controlled a litigation-funding contract entered into by a Kentucky resident, who was suing in Kentucky courts over a cause of action that arose in Kentucky.

Prospect argues that the district court erred because none of the Agreements selected Kentucky law to govern. Prospect acknowledges Kentucky's preference for applying its own law but argues that it is unjustified in this case. Prospect maintains that, as Kentucky has no clear policy prohibiting litigation-funding agreements, there is no reason to disregard the plain terms in the Agreements' choice-of-law provisions. Boling asks us to affirm the district court. He emphasizes Kentucky's strong preference for applying its own law and argues that, under Kentucky's choice-of-law rules, Kentucky is the jurisdiction with the most significant relationship to the Agreements. Boling relies on cases from Kentucky courts that have applied Kentucky law to contracts even when there was a specific choice-of-law provision pointing to another state's law. Boling maintains that because he is a Kentucky citizen, injured in Kentucky, and suing in that state, and because the Agreements are inconsistent with Kentucky public policy concerning champerty and usury, Kentucky courts would apply Kentucky law. We agree that the district court properly applied Kentucky law.

Kentucky's choice-of-law rules favor the application of its own law. *See Osborn v. Griffin*, 865 F.3d 417, 443 (6th Cir. 2017); *Wallace Hardware Co., Inc. v. Abrams*, 223 F.3d 382, 391 (6th Cir. 2000); *Johnson v. S.O.S. Transp., Inc.*, 926 F.2d 516, 519 n.6 (6th Cir. 1991). Kentucky follows the Second Restatement approach in determining the law that governs contracts. *State Farm Mut. Auto. Ins. Co. v. Hodgkiss-Warrick*, 413 S.W.3d 875, 878 (Ky. 2013). Under this approach, the "most significant relationship" test, "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties . . . ." Restatement (Second) Conflict of Laws § 188(1) (Am. Law Inst. 1971). A court determining which state has the most significant relationship must consider the "the place or places of negotiating and contracting; the place of performance; the location of the contract's subject matter; and the domicile, residence, place of incorporation and place of business of the parties." *Hodgkiss-Warrick*, 413 S.W.3d at 878–79 (citing Restatement (Second) § 188(2)). Kentucky has concluded that "[j]ustice, fairness and the best practical result may best be achieved by giving controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." *Breeding v. Mass. Indem. & Life Ins. Co.*, 633 S.W.2d 717, 719 (Ky. 1982).

Kentucky courts apply this test even when the parties included a choice-of-law provision in their contract.[10] *See Hodgkiss-Warrick*, 413 S.W.3d at 878–80; *Schnuerle v. Insight Commc'ns*

---

[10] The parties dispute the applicability of the Restatement (Second) Conflict of Laws § 187 (Am. Law. Inst. 1971), which provides a rule of decision for when parties select a choice-of-law provision to govern their contractual rights and duties. It does not appear, however, that Kentucky has adopted § 187. Although we discussed this provision in *Kipin Indus., Inc. v. Van Deilen Int'l, Inc.*, 182 F.3d 490, 493 (6th Cir. 1999), we were applying the choice-of-law rules of Michigan, which expressly follows §§ 187 and 188 of the Second Restatement's approach. We have noted that Kentucky courts have not applied or even mentioned § 187 when analyzing cases with contractual choice-of-law provisions. *See Wallace Hardware Co., Inc. v. Abrams*, 223 F.3d 382, 393 (6th Cir. 2000) (citing *Breeding v. Mass. Indem. & Life Ins. Co.*, 633 S.W.2d 717, 719 (Ky. 1982)).

*Co., L.P.*, 376 S.W.3d 561, 567 (Ky. 2012); *Breeding*, 633 S.W.2d at 719–20; *LaCrosse v. Owners Ins. Co.*, 531 S.W.3d 25, 30 (Ky. Ct. App. 2016). We have recognized as much. *See Osborn*, 865 F.3d at 444 ("Kentucky's most-substantial-relationship test trumps even an otherwise-valid choice of law clause when the dispute is centered in Kentucky.").

In *Breeding*, for example, the Supreme Court of Kentucky considered whether Delaware or Kentucky law applied to an insurance contract. 633 S.W.2d at 719. The insurance contract had a choice-of-law provision that provided that Delaware law controlled. *Ibid.* *Breeding* rejected the choice-of-law provision because Kentucky had a greater interest and more significant relationship: a Kentucky resident purchased the insurance in Kentucky from a Kentucky corporation, and the claim arose from a death in Kentucky. *Ibid.* Similarly, in *Schnuerle*, 376 S.W.3d at 566, the Supreme Court of Kentucky considered whether to apply a choice-of-law provision in a broadband internet service provider's Service Agreement with Kentucky residents. Relying on *Breeding*, the Court concluded that Kentucky law governed the Service Agreement because the members of the class were Kentucky residents, they had executed the agreement in Kentucky, and the equipment, internet service, and area where the service was provided were in Kentucky. *Id.* at 567. The court also noted Kentucky's "substantial interest" in protecting its residents, as well as the fact that one of the key claims arose under Kentucky law. *Ibid.*

Conversely, Prospect argues that *LaCrosse* indicates that the contractual choice-of-law provisions should be enforced. Prospect seizes on language in *LaCrosse* asserting that "[c]ourts will not disregard the plain terms of a contract between private parties on public policy grounds absent a clear and certain statement of strong public policy in controlling laws or judicial precedent." 531 S.W.3d at 30–31 (quoting *Hodgkiss-Warrick*, 413 S.W.3d at 880). But *LaCrosse* did not consider whether a choice-of-law clause applied—it considered whether public policy

should alter the choice-of-law result under the "substantial relationship test." *Id.* at 30–31. A resident of Illinois had been injured in Kentucky while driving a truck owned by his employer, an Illinois company. The truck was insured through policies negotiated and executed in Illinois. The sole issue in the case was the underinsured motorists' coverage applicable under those policies. *Id.* at 30. Therefore, the court explained, under Kentucky's choice-of-law rules, Illinois, not Kentucky, had the "most significant relationship to the formation and performance of the insurance contract . . . ." *Ibid.* The court explained that, as Kentucky did not have a clear public policy on uninsured motorists' coverage, or a compelling interest in applying its own laws, it would not ignore the result of Kentucky's "substantial relationship" test. *Id.* at 31.

*Hodgkiss-Warrick* follows the same analytical path. In that case, the court considered whether Pennsylvania or Kentucky law applied to an insurance dispute involving a Pennsylvania resident, injured in a car accident in Kentucky, whose insurance contract referred to Pennsylvania law, and her vehicle was registered, garaged, and used exclusively in Pennsylvania. 413 S.W.3d at 879. The court concluded that, absent a "compelling reason" not to apply Kentucky's usual choice-of-law rules, such as a strong Kentucky public policy, Pennsylvania law controlled. *Ibid.* Kentucky law did not require underinsured motorists' coverage, and so did not rise to the level of public policy. *Id.* at 881–82. Accordingly, Pennsylvania law applied under Kentucky's choice-of-law principles. *Id.* at 882. The court concluded that it would reach the same result even if Kentucky had such a policy because the dispute would effectively require Kentucky to inject its law into a dispute that had only a "fortuitous" connection to the state. *Ibid.* The contract was not made in Kentucky and did not involve Kentucky residents, therefore the court would not interfere with another state's policy choices. *Id.* at 882–83. These cases do not demonstrate that Kentucky will always uphold a contract's choice-of-law clause. Instead, these cases show that Kentucky

applies the "most-significant-relationship test" and considers whether public policy should dictate a different result based on Kentucky's interests. *See id.* at 880–81.

Applying the "most-significant-relationship" test, *see Hodgkiss-Warrick*, 413 S.W.3d at 878–79, we conclude that the district court did not err. The relevant states are Kentucky, New Jersey, New York, and Minnesota. Boling is a Kentucky resident who was injured in Kentucky and brought his underlying personal-injury lawsuit in Kentucky. The Agreements concern the proceeds of that lawsuit. The contracts were negotiated in communications between Boling and Prospect, and Boling and Cambridge, located in Kentucky, Minnesota, and New Jersey, respectively. The Agreements were executed in Kentucky. *See Schnuerle*, 376 S.W.3d at 567; *Breeding*, 633 S.W.2d at 719. Boling's claims arise under Kentucky law. *See Schnuerle*, 376 S.W.3d at 567. New Jersey has a very limited connection to the litigation. Cambridge is a Delaware corporation with a place of business in New Jersey, but Cambridge is not involved in this litigation. It assigned its interests to Prospect. New York's sole connection to the litigation is that Prospect is a New York LLC. Prospect has its principal place of business in Minnesota and negotiated some of the agreements from that location. Because this dispute is centered predominately in Kentucky, we conclude that the most-significant-relationship test prevails over the choice-of-law clauses. *Osborn*, 865 F.3d at 444.

Prospect argues that the clauses should be enforced because Kentucky does not have a "clear policy" prohibiting litigation-funding agreements. But, as the Supreme Court of Kentucky explained in *Hodgkiss-Warrick*, public policy may be found in clear statements of the law. 413 S.W.3d at 880. Kentucky has statutory prohibitions on champerty and usury. *See* Ky. Rev. Stat. §§ 372.060 (champerty); 360.010(1)(a) (lawful interest rates). Under the choice-of-law analysis, *Klaxon*, 313 U.S. at 496, Kentucky has the most significant relationships, it has a strong

preference for applying its laws, and the impact will be felt in Kentucky, where Boling and the proceeds of his lawsuit are located. *See Osborn*, 865 F.3d at 444 (considering where the effects of litigation will be felt). We conclude that Kentucky courts would apply Kentucky laws in construing these Agreements.

Because we conclude that the district court did not err in retaining jurisdiction over the claims arising from all four Agreements, or in determining that Kentucky law applied, we next consider whether the district court properly granted Boling's motion for summary judgment on the grounds that the Agreements violated Kentucky statutes prohibiting champerty and usury. *See Boling III*, 2017 WL 1193064, at \*1.

### C. Champerty and Usury

A court sitting in diversity must apply state law consistently with the then-controlling decision of the highest state court. *See Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 517 (6th Cir. 2001). The Supreme Court of Kentucky (or indeed, any of its courts) has not decided whether litigation-funding agreements violate Kentucky's prohibition on champerty and are unenforceable. *See Boling III*, 2017 WL 1193064, at \*1. If the state's highest court has not addressed the issue, we must decide, based on all available information, including decisions from the state's lower courts, what the state's highest court would do if the issue were before it. *Ziegler*, 249 F.3d at 517. We proceed with caution when making these predictions. *See Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004). We begin with champerty.

### *1. Champerty*

Kentucky's champerty[11] statute provides:

> Any contract, agreement or conveyance made in consideration of
> services to be rendered in the prosecution or defense, or aiding in

---

[11] Prospect asserts that Boling may not use champerty affirmatively to seek a declaratory judgment. Boling argues that once Prospect sought summary judgment against him, champerty was properly a defense. relies on

> the prosecution or defense, in or out of court, of any suit, by any person not a party on record in the suit, whereby the thing sued for or in controversy or any part thereof, is to be taken, paid or received for such services or assistance, is void.

Ky. Rev. Stat. § 372.060. The district court examined this statute, as well as Kentucky cases addressing champerty. *Boling III*, 2017 WL 1193064, at *3. It also considered *Stice*, 2009 WL 1975038, in which the Western District of Kentucky had affirmed a judgment of a bankruptcy court that litigation funding violated public policy. *Boling III*, 2017 WL 1193064, at *3–4. It concluded that the Supreme Court of Kentucky would likely find that the Agreements violated the doctrine of champerty and were void. *Id.* at 4. We review this determination *de novo*. *Mutchler*, 485 F.3d at 857.

Prospect argues that the Agreements do not violate Kentucky's champerty statute.[12] Prospect contends that the Agreements do not fit within the statutory definition of champerty. It asserts that Kentucky courts have permitted outside parties to acquire a contingent interest in the potential proceeds of a claim. Boling acknowledges that other jurisdictions may allow litigation funding but asserts that Kentucky's broad champerty statute bars the practice in Kentucky. He insists that the Agreements represent the kind of conduct the statute was intended to prohibit. Boling emphasizes that the terms of the Agreements interfere with his right to litigate over his

---

*McCullar v. Credit Bureau Sys., Inc.*, 832 S.W.2d 886 (Ky. 1992). In that case, the Supreme Court of Kentucky considered whether champerty could be a collateral cause of action. *Id.* at 887. The court explained that "[t]he champerty doctrine remains viable only as a defense in contract actions." *Ibid.* Although Boling initially filed a declaratory judgment action, Prospect initiated counterclaims for breach of contract. Boling raised champerty as a defense, which is consistent with *McCullar*, *ibid.* In any event, the district court did not consider the issue.

[12] Prospect argues that Boling is estopped from asserting champerty and usury because the Agreements contained clauses that waived any defense to payment, and he could have cancelled the Agreements within five days of entering into them. Prospect relies heavily upon the fact that Boling (and his former wife) were lawyers, who had legal representation. Boling points out that Prospect did not raise estoppel or the waiver clauses to the district court. As we have discussed *supra*, issues that are not litigated in the district court are not appropriate for appellate consideration. *Taft Broad. Co. v. United States*, 929 F.2d 240, 243 (6th Cir. 1991). A review of the parties' filings demonstrates that Prospect did not raise these issues below. Accordingly, Prospect has forfeited this argument.

personal injuries. Boling also asserts that Kentucky does not allow assignment of claims in personal-injury suits.

When interpreting a statute, Kentucky courts look to the plain terms of the statute. If the language is clear, the inquiry concludes. *Univ. of Louisville v. Rothstein*, 532 S.W.3d 644, 648 (Ky. 2017). The words of a statute must receive their literal meaning unless doing so would lead to absurd or unreasonable results. *Ibid.*; *see also Shawnee Telecom Res., Inc. v. Brown*, 354 S.W.3d 542, 551 (Ky. 2011). Our analysis begins with the plain language of Ky. Rev. Stat. § 372.060.

First, the statute has a broad reach—it covers "[a]ny contract, agreement or conveyance." The parties do not dispute that the four litigation finance Agreements constitute a "contract" or "agreement." *See* Ky. Rev. Stat. § 372.060. Next, the statute requires that the contract, agreement, or conveyance be made "in consideration of services to be rendered in the prosecution or defense, or aiding in the prosecution or defense . . . of any suit . . . ." *Ibid.* The assistance or services may apply "in or out of court," which supports Boling's argument that the assistance need not be confined solely to litigation. *Ibid.* This assistance or service must be provided "by any person not a party on record in the suit." *Ibid.* The underlying suit is the litigation Boling initiated against Blitz USA. Cambridge and Prospect were not parties on record in that litigation. *See Willhoit's Adm'x v. Richardson*, 236 S.W. 1025, 1027 (Ky. 1921) ("[T]he expression 'a party on record in such suit' . . . means the real party in interest . . . ."). The party rendering assistance may not take, be paid with, or receive the "thing sued for or in controversy or any part thereof . . . ." Ky. Rev. Stat. § 372.060; *see also Willhoit's*, 236 S.W. at 1027. If an agreement, contract, or conveyance satisfies the criteria set forth in the statute, it is void. Ky. Rev. Stat. § 372.060.

At first glance, the four Agreements appear to satisfy these criteria. The Agreements provide that Prospect (and Cambridge) would receive part of "the thing sued for or in controversy" in return for its assistance. *See* Ky. Rev. Stat. § 372.060. Prospect maintains that it did not provide "services or assistance," because it was not involved in the suit. But the statute provides that the services or assistance may be provided "in or out of court," so under the plain language of the statute, Prospect and Cambridge were not required to assist in the actual litigation. *See Univ. of Louisville*, 532 S.W.3d at 648. The issue here is whether Kentucky would consider funding provided to plaintiffs under these circumstances to be services or assistance within the meaning of the statute. Kentucky has construed "assistance" within the meaning of this statute broadly.

In *Charles v. Phillips*, 252 S.W.2d 920, 921 (Ky. 1952), Goff and Phillips entered into a contract that advanced Goff sufficient funds to sue for divorce and seek restoration of his property in exchange for the title to that property. The Kentucky Court of Appeals concluded that this violated Kentucky's champerty statute and so was void because Phillips gave Goff money to finance his litigation and in exchange, received part of the subject of that litigation—Goff's land. *Id.* at 921–22. Similarly, in *Skinner v. Morrow*, 318 S.W.2d 419, 429 (Ky. 1958), the Kentucky Court of Appeals concluded that an "heir-hunting" contract between a company and an heir to an estate violated Ky. Rev. Stat. § 372.060. The contract between the heir and the company assigned 25% of the heir's share to the company "in consideration" of having told the heir about the assets and assisted him in determining the extent of those assets. *Ibid.* The company acted as the heir's agent and bore all the litigation expenses. *Ibid. See also Willhoit's*, 236 S.W. at 1027 (contract entered into by administrator of estate in his individual capacity to recover a portion of the estate as a fee for his "services rendered in the prosecution of the suit" was void under Kentucky statute prohibiting champerty).

*Skinner* and *Willhoit's* involved assistance more directly tied to the litigation. *See Skinner*, 318 S.W.2d at 429 (company acted as heir's agent); *Willhoit's*, 236 S.W. at 1025 (administrator helped to prepare case). Even so, in *Skinner*, the company's contract contemplated recovering a portion of the estate simply for notifying the heir. 318 S.W.2d at 429. *Charles* demonstrates that advancing financial assistance for litigation also qualifies as champerty. 252 S.W.2d at 921–22. Although the funding in *Charles* presumably went directly towards litigation, the 2009 and 2010 Agreements characterize Prospect's role as assisting Boling with his expenses because he had not yet received payment from the defendant in his case. Similarly, the 2012 and 2013 Agreements provide that "to ensure the receipt of some proceeds in connection with the Legal Claim without regard to its outcome, [Boling] desires to sell an interest in the Proceeds to [Prospect]." The Agreements injected Prospect's interests into Boling's case, and directly provided that Prospect would "assume [the] risk of resolution" of Boling's case. Based on these cases, we conclude that because these Agreements effectively represented an advance on Boling's recovery, contingent on Boling recovering funds, the Supreme Court of Kentucky would likely conclude that the Agreements constitute "assistance" within the meaning of the statute. *See Fordson Coal Co. v. Garrard*, 125 S.W.2d 977, 981 (Ky. 1939) (compensation that depends on the success of the prospective lawsuit supports finding that an agreement is champertous).

*Stice*, 2009 WL 1975038, at *3, reached the same conclusion. There, the district court reasoned that the Supreme Court of Kentucky would prohibit assignment of part of the proceeds of a personal-injury cause of action. The district court explained that Kentucky forbids assigning personal-injury causes of action because it "invites speculation on another's pain and suffering[,]" which is against Kentucky's public policy. *Id.* at *2–3. Although *Stice* cannot carry as much weight as cases from Kentucky, it is evident that Kentucky has a strong public policy against such

assignments. In *Wittenauer v. Kaelin*, 15 S.W.2d 461, 462–63 (Ky. 1929), the court concluded that an unliquidated claim of personal injuries could not be attached in garnishment. Such claims, the court explained, could not be assigned because "a claim for personal injuries is peculiarly a personal right that the injured party may or may not assert as he pleases, and . . . to permit one's pain and suffering to become a matter of speculation is not looked upon with favor by the law." *Id.* at 462. The prohibition on voluntary assignments is intended, among other things, to prevent the injured party from being compelled to prosecute a claim that he may not wish to prosecute. *Id.* at 462–63.

As Boling points out, the terms of the Agreements effectively give Prospect substantial control over the litigation. For example, the 2009 and 2010 Agreements permit Prospect (standing in for Cambridge) to require Boling to execute documents or pay filing fees to protect Cambridge's interest.[13] Those Agreements provide that if Boling "intentionally and/or negligently defaults in the performance of any obligation required to protect and preserve the Litigation, [Boling] shall be liable to [Cambridge]" for the full amount of the loan, including the interest. They also stated that Cambridge could seek specific performance if Boling defaulted on any conditions required in the Agreement.[14] All four Agreements limited Boling's right to change attorneys without Prospect's consent, otherwise Boling would be required to repay Prospect immediately.[15] These

---

[13] The 2009 and 2010 Agreements identified Boling's case files as the "collateral." Cambridge had the right to examine the "case files and to inspect the correspondence, books and records relating to [Boling's] case or claim." The 2012 and 2013 Agreements authorized Prospect to request "pleadings, notices, orders, motions, briefs or other documents . . . correspondence," Boling's medical records, and "documents relating to any other material developments with respect to" Boling's claim or recovery in the suit.

[14] The 2012 and 2013 Agreements did not identify specific performance, but give Prospect "all rights, powers and remedies provided in this Purchase Agreement and as allowed by law or in equity" in the event of a default.

[15] The 2012 and 2013 Agreements actually provided that if Boling replaced his attorney, or hired an additional attorney, without notifying Prospect and ensuring that the new attorney executed an acknowledgement of the litigation-funding agreement, Boling was immediately required to pay Prospect the amount due at 40 months of funding (over $34,000 for the $5,000 loan in the 2012 Agreement and over $68,000 for the $10,000 loan in the 2013 Agreement) regardless of when Boling changed attorneys.

kinds of conditions raise quite reasonable concerns about whether a plaintiff can truly operate independently in litigation. *See Wittenauer*, 15 S.W.2d at 462–63. The district court observed that agreements like this may interfere with or discourage settlement, which is inconsistent with Kentucky's public policy, "because an injured party may be disinclined to accept a reasonable settlement offer where a large portion of the proceeds would go to the firm providing the loan." *Boling III*, 2017 WL 1193064, at *4. Kentucky has a strong public policy favoring settlement. *See Wehr Constructors, Inc. v. Assurance Co. of Am.*, 384 S.W.3d 680, 689 (Ky. 2012). Kentucky has prohibited champerty because such conduct encourages and multiplies litigation. *See Fordson Coal Co.*, 125 S.W.2d at 981; *Willhoit's*, 236 S.W. at 1027.

Prospect points to cases in which Kentucky has permitted one party to assign claims to another party, which it asserts, shows that Kentucky would not hold that litigation-funding agreements violate the statutory prohibition on champerty.[16] But these cases did not address champerty. In *Davis v. Scott*, 320 S.W.3d 87, 91 (Ky. 2010), the Supreme Court of Kentucky concluded that a settlement agreement that required Davis to pursue a legal-malpractice claim against his former attorney, Scott, and then assign 80% of the proceeds of that suit to the other settling party, Global, violated Kentucky law prohibiting assignment of legal-malpractice claims.

---

[16] Prospect argues that the district court disregarded the Supreme Court of Kentucky's tendency to examine the trend of laws in sister states. Although we may consider decisions from other jurisdictions, absent "some authoritative signal from the state's legislature or judiciary, however, federal courts in diversity cases 'should be extremely cautious about adopting substantive innovation in state law.'" *State Auto Property & Cas. Ins. Co. v. Hargis*, 785 F.3d 189, 195 (6th Cir. 2015) (quoting *Combs v. Int'l Ins. Co*, 354 F.3d 568, 578 (6th Cir. 2004). As Kentucky does not have a statutory system that expressly permits litigation funding, we are reluctant to conclude that other jurisdictions' embrace of the practice demonstrates that Kentucky would do so. Before the district court (and here), Boling and Prospect argue about the significance of proposed legislation in the Kentucky General Assembly to authorize and regulate litigation funding. *See Boling III*, 2017 WL 1193064, at *5. The district court concluded that the General Assembly's refusal to pass the law, coupled with Kentucky's statute prohibiting champerty, Ky. Rev. Stat. § 372.060, weighed more in favor of rejecting Prospect's position. *Boling III*, 2017 WL 1193064, at *5. Kentucky has given mixed weight to legislative inaction, as the district court observed. *Ibid.* (citing *Shawnee Telecom Res., Inc. v. Brown*, 354 S.W.3d 542, 560 (Ky. 2011), and *Coslow v. Gen. Elec. Co.*, 877 S.W.3d 611, 614 (Ky. 1994). Accordingly, because there is no authoritative signal from the state legislature or judiciary, we consider Prospect's arguments about the legality of litigation funding unpersuasive in predicting what the Supreme Court of Kentucky would hold.

The terms of the settlement gave Global almost complete control over the litigation. The court did not address whether Davis could assign the proceeds, but it concluded that the 80% allocation was improper because it created an incentive for Global to win the largest judgment possible, not just succeed. *Ibid.* Similarly, *Associated Ins. Svc., Inc. v. Garcia*, 307 S.W.3d 58, 63 (Ky. 2010), considered whether a professional malpractice claim against an insurance agent or broker could be assigned. *Garcia* recognized that unliquidated tort claims for personal injury could not be assigned because to do so would violate public policy. *Id.* at 62–63 (citing *Wittenauer*, 15 S.W.2d at 462).

Prospect also asserts that the district court should have followed *Abrams v. Fitts*, No. C 76-0145 L(A), 1979 WL 1304 (W.D. Ky. Jan. 18, 1979). Abrams and Fitts were business partners, and at the time their partnership dissolved, it had incurred tax liabilities. Abrams paid his half of the taxes, but the IRS demanded payment in full. Abrams wrote a check payable to Fitts and the IRS, which Fitts endorsed to the IRS. *Id.* at *1. Fitts then signed a promissory note to Abrams for the amount of that check and stated that he assigned Abrams the net proceeds of a pending personal-injury suit that Fitts had brought. *Ibid.*

Fitts then accumulated additional tax liabilities. The United States and Abrams disputed who should receive repayment first. The United States argued that Fitts's assignment to Abrams was invalid under Kentucky law. *Ibid.* The district court noted that, although an unliquidated claim for personal injury could not be assigned per *Wittenauer*, it was not clear whether the proceeds of a tort claim could be assigned. *Id.* at *2. It concluded that *State Farm Mut. Auto. Ins. Co. v. Roark*, 517 S.W.2d 737 (Ky. 1974), permitted a third-party to acquire an interest in the recovery of such a claim, and so the assignment was valid. *Ibid.*

In *Roark*, 517 S.W.2d at 738–39, the Supreme Court of Kentucky considered whether an insurance policy provision establishing an insurer's right to subrogation was valid. *Id.* at 738–39.

It observed that most jurisdictions that permitted subrogation of medical payments did not prohibit assignment of personal-injury claims. *Id.* at 739. The jurisdictions that did permit subrogation treated it as a lien. The court reiterated its policy that claims for personal injury could not be assigned per *Wittenauer*. But, it observed, it had permitted subrogation for damage to personal property, and the General Assembly allowed subrogation in workers' compensation law. The court held that an insurance company could validly include subrogation in its policy and recover the amount that it had paid to its insured from the person who caused the injuries. *Ibid.*

The facts in *Abrams* are distinct from this case—the promissory note Fitts provided Abrams does not satisfy the definition of champerty in Ky. Rev. Stat. § 372.060. *Abrams* offers only a limited analysis, limiting its focus to *Roark* and we agree with the district court that *Abrams* does not provide much clarity. *See Boling III*, 2017 WL 1193064, at *5; *Abrams*, 1979 WL 1304, at *2. *Roark* examined subrogation, which while it may bear some resemblance to the Agreements here, was a practice that Kentucky had already approved of. *See* 517 S.W.2d at 739.

The Agreements contemplated that Prospect would, in exchange for providing funding to Boling to assist him in pursuing litigation, receive compensation from Boling's award. Under these circumstances, we conclude that the Supreme Court of Kentucky would hold that the Agreements violate Ky. Rev. Stat. § 372.060, and that the Agreements are inconsistent with Kentucky's public policy. The district court did not err in granting summary judgment to Boling on this issue and holding that the Agreements were void.[17]

---

[17] Prospect argues that the Agreements should not have been declared void, but Ky. Rev. Stat. § 372.060 states that any contracts that violate its prohibition on champerty are void. As we have affirmed the judgment of the district court on this ground, we will not disturb the district court's conclusion that the Agreements were void. *See Boling III*, 2017 WL 1193064, at *7 (rejecting Prospect's argument that Boling could be in breach of contract because the Agreements were void and Prospect could not enforce them as a matter of law).

*2. Usury*

Although the district court's holding that the Agreements were void was sufficient to resolve the enforceability of the Agreements, the district court also addressed usury. The district court also concluded that the interest rates in the four Agreements violated Ky. Rev. Stat. § 360.010(1) (2016).[18] *Boling III*, 2017 WL 1193064, at *7. When Boling entered into the Agreements with Cambridge and Prospect, the statute provided that the legal rate of interest was 8% per annum. Ky. Rev. Stat. § 360.010(1) (2016). Parties could agree in writing for a higher rate of interest:

> (a) at a per annum rate not to exceed four percent (4%) in excess of the discount rate on ninety (90) day commercial paper in effect at the Federal Reserve Bank in the Federal Reserve District where the transaction is consummated or nineteen percent (19%), whichever is less, on money due or to become due upon any contract or other obligation in writing where the original principal amount is fifteen thousand dollars ($15,000) or less, and (b) at any rate on money due or to become due upon any contract or other obligation in writing where the original principal amount is in excess of fifteen thousand dollars ($15,000); and any such party or parties, and any party or parties who may assume or guarantee any such contract or obligation, shall be bound for such rate of interest as is expressed in any such contract, obligation, assumption, or guaranty, and no law of this state prescribing or limiting interest rates shall apply to any such agreement or to any charges which pertain thereto or in connection therewith; provided, however, nothing herein contained shall be construed to amend, repeal, or abrogate any other law of this state pertaining to any particular types of transactions for which the maximum rate of interest is specifically prescribed or provided.

*Ibid.* The district court noted that each Agreement was for less than $15,000 (two loans of $5,000 and two loans of $10,000). *Boling III*, 2017 WL 1193064, at *6. The Agreements accrued interest at the rate of 4.99% per month, and "[d]uring the term of the Agreements, the 90-day commercial paper discount rate at the Federal Reserve Bank in the relevant district has hovered far below 1%."

---

[18] Ky. Rev. Stat. § 360.010(1) has been amended twice since Boling entered into the Agreements with Cambridge and Prospect. *See* 2017 Ky. Laws ch. 17, § 1; 2018 Ky. Laws ch. 140, § 1.

*Ibid.* Therefore, the district court calculated, the maximum rate of interest permissible was "the lower of roughly 5% (4% + less than 1%) or 19%, or somewhere below 5% per annum." *Ibid.* The annual rate of interest on the Agreements, the district court concluded, clearly violated Ky. Rev. Stat. § 360.010(1). It also determined that the civil penalty for violating the statute included forfeiture of *any* interest. *Ibid.* (citing Ky. Rev. Stat. § 360.020(1). The district also rejected Prospect's argument that Ky. Rev. Stat. § 360.010(1) did not apply because the Agreements were not "loans" because the plain language of the statute applied to agreements other than loans. *Ibid.* at *7.

Relying on *Dublin v. Veal*, 341 S.W.2d 776 (Ky. 1960), Prospect argues that, as the Agreements are not loans, the usury statute does not apply. Prospect insists that the district court erred by predicting that Kentucky would not adopt a rule chosen by a number of other jurisdictions: if, in a contract, the payment of interest on the principal is subject to a contingency that puts the creditor's entire profit or return at risk, the interest need not be limited to the rate set in usury statutes as long as the contract was made in good faith and without the intent to evade usury laws. *See Beausejour Corp., N.V. v. Offshore Dev. Co.*, 802 F.2d 1319, 1322 (11th Cir. 1986). Boling asserts that the Kentucky usury statute does not limit the kinds of transactions it covers to loans. Boling maintains that *Dublin* is, as the district court concluded, inapplicable because it involved an investment in an ongoing commercial enterprise, and not a personal injury suit. Boling urges us to affirm the district court's ruling that the Agreements are void.

First, Ky. Rev. Stat. § 360.010(1) (2016), demonstrates that the transaction at issue does not have to be a loan. Whether or not Prospect calls the Agreements loans or "non-recourse investment[s]" for the purpose of a usury analysis is irrelevant. *See Grace v. LVNV Funding, Inc.*, 22 F. Supp. 3d 700, 703–04 (W.D. Ky. 2014) (if party claims usury, Kentucky looks "past the

form of the transaction to its substance" (citing *Hurt v. Crystal Ice & Cold Storage Co.*, 286 S.W. 1055, 1056–57 (Ky 1926))). The statutory provision at issue refers to "money due or to become due upon any contract or other obligation in writing . . . ." *Ibid.* Prospect's argument is simply inconsistent with the plain terms of the statute. *See Univ. of Louisville*, 532 S.W.3d at 648 (courts look to the plain terms of the statute and give the words their literal meaning unless doing so would lead to an absurdity). Further, the district court did not err in its calculations—the interest rate provided for in the Agreements far exceeds the permissible statutory rate. *See Boling III*, 2017 WL 1193064, at *6.

Prospect argues that *Dublin v. Veal*, 341 S.W.2d 776, 777–78 (Ky. 1960), has adopted the rule that if payment of interest on the principal is subject to a contingency, which puts the creditor's profit at risk, the interest does not need to be limited to the maximum set by usury statutes as long as the contract was made in good faith and without the intent to evade the usury laws. *Dublin*, however, presents a different set of circumstances. In that case, Veal loaned Dublin $20,000 to invest in his car sale business in exchange for one-third of the profits from the sale of cars and half the profits from car finance contracts. *Id.* at 777. When the contract terminated, Veal would receive his $20,000, along with the profits Dublin owed him. Dublin argued that allowing Veal to receive the profits and the principal amounted to usury. *Ibid.* The court cited the rule that Prospect raises, *id.* at 777–78, but continued, explaining that a loan contract that stipulated for a portion of the profits to the lender as a partner was not usurious even though the profits could be above the statutory interest limits. *Id.* at 778. The court concluded that *this* principle applied: "Payment for the use of [Veal's] money was contingent on the success of a commercial enterprise, wherein the risk of receiving less than the legal rate of interest, or even no profit at all, was real and substantial." *Ibid.*

Prospect points to no other authority, nor any other cases from Kentucky that have adopted the rule it prefers. *Dublin* appears to be cabined to the facts it presents. Further, that case concerned *profits*, not interest. *Id.* at 777. Here, Prospect and Boling were not engaged in a commercial enterprise. As we have discussed, *supra*, if this were a commercial enterprise, it would run afoul of Kentucky's public policy that prevents assignment of personal-injury claims as impermissible speculation on another's pain and suffering. *See Roark*, 517 S.W.2d at 739; *Wittenauer*, 15 S.W.2d at 462. Further, the Agreements expressly provide for *interest* rates far above the legal statutory limit, not *profit*. In light of the express language in Ky. Rev. Stat. § 360.010(1), we hold that the district court did not err in granting summary judgment to Boling on the basis that that the interest rates in the Agreements violate Kentucky's usury statutes.

The judgment of the district court is AFFIRMED.